RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JULIE GALLAGHER,

        *Plaintiff-Appellant,*

     *v.*

C.H. ROBINSON WORLDWIDE, INC.,

        *Defendant-Appellee.*

No. 08-3337

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-02443—Dan A. Polster, District Judge.

Argued: January 22, 2009

Decided and Filed: May 22, 2009

Before: GIBBONS and McKEAGUE, Circuit Judges; SHADUR, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Douglas L. Micko, SCHAEFER LAW FIRM, Minneapolis, Minnesota, for Appellant. Bruce G. Hearey, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, Cleveland, Ohio, for Appellee. **ON BRIEF:** Douglas L. Micko, SCHAEFER LAW FIRM, Minneapolis, Minnesota, Bruce B. Elfvin, ELFVIN & BESSER, Cleveland, Ohio, for Appellant. Bruce G. Hearey, Sara E. Hutchins, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, Cleveland, Ohio, for Appellee.

_____

## OPINION
_____

    McKEAGUE, Circuit Judge. Plaintiff Julie Gallagher was employed by defendant C.H. Robinson Worldwide, Inc., in Cleveland as a transportation specialist for

_____

[*]The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

four months. Throughout this period, she complained to her immediate supervisor about the crude and offensive language and conduct of her co-workers, but her complaints fell on deaf ears. Disgusted, she resigned. Nearly four years later, she commenced this action in the Northern District of Ohio, suing C.H. Robinson Worldwide for sexual harassment (hostile work environment) under federal and state law. The district court granted defendant's motion for summary judgment, finding plaintiff failed to present sufficient evidence to make out a prima facie case. On appeal, Gallagher argues that the record evidence is sufficient to create genuine issues of material fact.

Reviewing the record in the light most favorable to Gallagher, we find the district court's assessment of the prima facie case elements to be flawed in several respects. We find the record facts are sufficient to create genuine fact issues which preclude summary judgment. We therefore reverse the district court's ruling and remand the case for further proceedings.

## I. FACTUAL BACKGROUND[1]

In August 2002, Plaintiff Julie Gallagher, who had worked for two years as a sales representative for a transportation logistics company in Michigan called Con-Way Truckload Services ("Con-Way"), was looking for a similar position in Cleveland, Ohio. She initially looked into transferring into another position within Con-Way in Cleveland, but no such position was available. She was told, however, that Con-Way was going to create an outside sales force within the next five years. Meanwhile, Gallagher discovered that there was a sales opening at another transportation logistics company in Cleveland, Defendant CHR, thought it was a good fit and commenced employment there on September 3, 2002.

At that time, the Cleveland office of CHR employed approximately 20 sales employees and 3 support personnel. Sales employees' job duties included booking freight loads, ensuring the timely and safe arrival of loads and negotiating rates. In order to carry out those duties, the sales staff worked in cubicles (work stations) that were organized in pods in an open floor plan. Short dividers separated them so

---

[1] The district court's opinion includes a fair summary of the factual background. It is here reproduced in its entirety. Memorandum of Opinion and Order pp. 1-7, JA 21-27; *Gallagher v. C.H. Robinson Worldwide, Inc.*, 2008 WL 471693 at *1-3 (N.D. Ohio Feb. 19, 2008) (citations to record and footnotes omitted).

they could freely communicate with one another while conducting business. The sales staff used telephones and computers [to] facilitate their transactions, and had access to the Internet to conduct their business. The short divider walls between cubicles provided little privacy; co-workers' computers were fairly visible to each other, conversations between employees as well [as] phone conversations with customers were readily overheard. The environment at the Company was noisy, the job was high pressured and fast paced.

It is into this environment that Gallagher entered in September 2002. Gallagher began her employment as a transportation sales representative on a dubious note. She was interviewed by, among other potential co-workers and the branch manager, another transportation sales representative named Bryan Starosto who made it clear that he did not want to interview her. Despite this unpleasant interview, however, CHR offered her a sales position and she accepted it. She maintained this position until four months later, when she left CHR to become part of Con-Way's newly created outside sales force in Cleveland at a higher salary.

Gallagher describes the atmosphere at the Cleveland office of CHR during her four-month tenure as being much like "a guys' locker room" characterized by unprofessional behavior on the part of both males and females, and an environment that was hostile to women. She testified to the prevalent use of foul language by mostly male coworkers who openly and loudly referred to female customers, truck drivers, co-workers and others as bitches, whores, sluts, dykes and cunts. She testified that male and female co-workers viewed sexually explicit pictures on their computers (although the only incident she could specifically recall was a sexually explicit picture on co-worker Angela Sarris' computer during the Christmas holidays), and that male co-workers left pornographic magazines lying open on their desks. Gallagher testified that, on several occasions, Starosto brought in nude pictures of his girlfriend in different sexual poses and shared those pictures with several of his male co-workers who occasionally brought in, and shared, pictures of their own with him. She testified that her male co-workers traded sexual jokes and engaged in graphic discussions about their sexual liaisons, fantasies and preferences in her presence on a daily basis. Gallagher also testified that some of the employees drank beer in the office in the afternoon on Fridays, that some male co-workers came in to the office on Saturdays (when branch manager Greg Quast was not there) without a shirt on, that one woman planned her entire wedding at the office, and that another planned her baby shower at the office.

When Gallagher was asked at deposition to testify to instances of sexually offensive conduct directed at her, she testified that Starosto

called her a "bitch" in anger on several occasions, usually in response to her request to male co-workers to keep their sex jokes to a minimum or to put away their pornography. Gallagher also testified that, on one occasion, several male co-workers near her desk joked that "by hiring [Gallagher, CHR] covered two quotas; the girl quota and the fat quota." Gallagher alleges that Starosto made several derogatory comments about her weight, and [Warren] Liehr once referred to Gallagher as a "heifer" with "milking udders," and "moo"ed when she walked by his desk. Gallagher testified that on one Saturday when she was scheduled to work, three male co-workers came into the office following a session at a gym in the building next door. Co-worker David Derryberry, who was wearing only a towel and announced that he was "commando" (meaning that he was wearing no underwear) sat on Starosto's desk, displaying his whole thigh, and talked with the others about anal sex, their enjoyment of it and how Starosto's girlfriend objected to it. On the next business day, Gallagher complained to Quast about this incident and told him she did not want to work on Saturdays anymore.

When asked if anyone had any objectionable physical contact with her, Gallagher testified that, in the second month she worked at CHR, Liehr put his chair in the aisle to block her way. Although he moved his chair when she asked him, she apparently walked into him inadvertently when she passed by. Gallagher described this as primarily a hostile encounter, but believed that it had sexual connotations since it involved unwanted contact; still, she never reported the incident to anyone. Gallagher also testified that, on two or three occasions, Starosto would put his legs in the aisle when he would see her get up from her seat to go to the printer. When she asked him to move his legs, he would do so after waiting a moment. She believed that this behavior was both "sexual and hostile" but does not recall reporting the incidents to Quast.

CHR has policies prohibiting discrimination and harassment on the basis of gender, and prohibiting the electronic dissemination of sexually explicit materials through e-mail or the Internet. Gallagher received copies of these policies on her first day of work. The sexual harassment policy requires employees to report complaints of sexual harassment to the legal department, the branch resources manager, or the branch manager. It provides names and phone numbers for the legal department and the branch resources manager. Although Gallagher signed an acknowledgment stating that she read the policy and agreed to comply with its terms, she testified at deposition that she did not recall reading it before signing it, that she did not keep a copy of it and that she could not recall asking anyone for a copy. The sexual harassment and e-mail and Internet policies are also available on the company's internal website, along with an anonymous third-party toll-free hotline and an

anonymous e-mail service for reporting incidents of discrimination or inappropriate behavior.

Additionally, CHR employees are required to sign certificates stating that they have complied with CHR's policies during the preceding year – and that if they have any questions about those policies, to contact the Compliance Officer before signing the certificate. Although Gallagher testifies that the sexually offensive conduct occurred from the beginning of her employment, she signed a compliance certificate on November 25, 2002, but never contacted the Compliance Officer regarding offensive conduct.

Rather, Gallagher testified that she complained frequently to Quast about the unprofessional and sexually offensive workplace conduct to little or no avail. Although Quast had his own office, he seldom used it; and he usually required Gallagher to voice her complaints to him at his work station. Often, he would simply yell at the offending employee to stop the conduct because it was bothering Gallagher which, she says, subjected her only to more ridicule. Although Gallagher was aware of the anonymous 800 tip line, she refused to use it because some co-workers and Quast referred to the number as "the waw-waw line" and one co-worker told her not to call the line because the last person who did, lost her job.

In early December 2002, three months after Gallagher commenced her employment at CHR, the Vice President of Con-Way (Don Fegtley) called Gallagher at her home to inquire whether she was happy at CHR and to inform her that Con-Way might be moving forward with an outside sales position in Cleveland. Shortly thereafter, Fegtley called Gallagher back and confirmed an opening, she confirmed her interest in it and, in a letter dated December 13, 2002, Con-Way formally offered her the position contingent upon submission of an application and a background check.

Gallagher claims, however, that she only decided to quit her job at CHR on January 3, 2003. This was the day of the National Championship football game between Ohio State University and the Miami Hurricanes. She testified that a female co-worker brought Jello shots into the office that day and that, in the early afternoon, many co-workers stopped working and started drinking. When Gallagher left, she discovered that she had a flat tire, went back into the office and asked for help changing it. Several drunk male co-workers laughed at her and when they left the building, they got into their trucks and "flipped her off" when passing her by. However, a male and female co-worker eventually assisted her. Although Gallagher claims this incident is the one that motivated her to quit her job at CHR, she did not actually quit until

January 8, 2003 and began working for her previous employer, Con-Way, on January 13, 2003.

## II.  PROCEDURAL BACKGROUND

On October 10, 2006, Gallagher commenced this action, asserting claims against C.H. Robinson for maintaining a sexually hostile work environment, advanced under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (Count I), and under Ohio Revised Code § 4112.99 (Count III); for failing to provide a safe work environment free from sexual harassment, per *Kerans v. Porter Paint Co.*, 575 N.E.2d 428 (Ohio 1991) (Count IV); and for failing to allow her to compete for, and promote her to, a better position within the company (Count II).  After completion of discovery, defendant moved for summary judgment on all claims.  In response, Gallagher voluntarily dismissed the Count II failure-to-promote claim, but she otherwise opposed the motion.

The district court issued its ruling on February 19, 2008, granting the motion for summary judgment.  Concluding that all three sexual harassment claims were governed by the same standards, the court determined that the evidence failed to satisfy three required elements of a hostile work environment claim.  First, the evidence was deemed insufficient to support a finding that the harassment Gallagher experienced was based on her sex.  The court found that most of the offensive language and conduct was "indiscriminate;" i.e., was not directed at plaintiff, and was not shown to have occurred *because* Gallagher is a woman.  Second, the harassing conduct, albeit subjectively offensive to Gallagher, was deemed not to be so objectively severe and pervasive as to have unreasonably interfered with her work performance.  Third, the court concluded that C.H. Robinson could not be held liable for offensive conduct engaged in by its employees because Gallagher failed to take advantage of several available avenues for reporting the conduct to upper management, but instead reported it only to her immediate supervisor, who she acknowledged could not handle the situation. On appeal, Gallagher challenges all of these conclusions, contending the district court wrongly construed facts in the company's favor, gave significant weight to irrelevant facts, and erred in its legal analysis and conclusions.  We agree.

## III.  ANALYSIS

### A.  Standard of Review

We review de novo an order granting summary judgment.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  We must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *White*, 533 F.3d at 390.  Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact.  *Id.*  A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.  *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law.  *Id*. at 298-99.

As to the governing substantive law, the district court correctly recognized that sexual harassment claims under Ohio Revised Code § 4112 are generally governed by the same standards as sexual harassment claims under Title VII, citing *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 731 (Ohio 2000); *Greenwood v. Delphi Auto. Sys.*, 103 F. App'x 609, 612 n. 1 (6th Cir. 2004).  *See also Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 561 (6th Cir. 2004).  Accordingly, like the district court and the parties, we analyze Gallagher's hostile work environment claims collectively under federal law standards.

To establish a prima facie case of sexual harassment based on hostile work environment, Gallagher must adduce evidence demonstrating that "(1) she is a member of a protected class (female); (2) she was subjected to harassment, either through words or actions, based on sex; (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive

work environment; and (4) there exists some basis for liability on the part of the employer." *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008). The district court found the evidence wanting on elements (2) through (4).

**B. Harassment "Based on Sex"**

The district court was persuaded by C.H. Robinson's argument that most of the complained of offensive conduct in its Cleveland office was common and indiscriminate, was not targeted at Gallagher, would have taken place whether Gallagher was present or not, and therefore was not "based on" Gallagher's femaleness. This conclusion reflects a mistaken perception of what is required to find that conduct is "based on sex" in the legal sense.

There were instances in the workplace when Gallagher was repeatedly called a "bitch" by a co-worker in anger, was referred to by another as a "heifer" with "milking udders," and was taunted by a male co-worker wearing nothing but a towel around his waist when she was the only female in the office. These incidents, in which offensive conduct was directed at Gallagher, reflect sex-discriminatory animus. Yet, the record suggests that much of the other highly offensive conduct was not directed at Gallagher. Among the commonplace offensive occurrences, Gallagher complained of: co-workers' vulgar descriptions of female customers, associates and even friends as "bitches," "whores," "sluts," "dykes," and "cunts;" co-workers' joint ogling and discussions of obscene photographs and pornographic magazines; and co-workers' explicit conversations about their own sexual practices and strip club exploits. Gallagher could not avoid exposure to these offensive behaviors because they occurred in close proximity to her work station, where she was required to be. Still, the offensive conduct does not appear to have been motivated by Gallagher's presence or by the fact that she is a woman.

The district court cited *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999), for the proposition that the "based on sex" element makes it incumbent on Gallagher to show that the offensive conduct "occurred because she is a woman." The court concluded that because much of the offensive conduct Gallagher complained of

occurred in an open forum where men and women worked together, it did not occur because she is a woman and was therefore not based on sex. Quoting *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301 (11th Cir. 2007), the court observed that "[i]t would be paradoxical to permit a plaintiff to prevail on a claim of discrimination based on indiscriminate conduct."

The district court's reliance on *Williams* is misplaced. In *Williams*, the court was addressing a different question, i.e., whether harassing conduct that is *not* sexually explicit may nonetheless satisfy the "based on sex" requirement. The court answered the question in the affirmative, as long as the non-sexual conduct evinces anti-female animus. *Williams*, 187 F.3d at 565. In other words, even non-sexual harassing conduct may be deemed to be based on sex if the plaintiff is otherwise able to show that, but for the fact of her sex, she would not have been the object of the harassment. *Id.*

Here, in contrast, most of the complained of harassment just summarized—both conduct directed at Gallagher and indiscriminate conduct—*is* explicitly sexual and patently degrading of women. The natural effect of exposure to such offensive conduct is embarrassment, humiliation and degradation, irrespective of the harasser's motivation—especially and all the more so if the captive recipient of the harassment is a woman. In connection with such evidence, it is hardly necessary for Gallagher to *otherwise* show that the conduct evinces anti-female animus; it is obvious. Hence, even though members of both sexes were exposed to the offensive conduct in the Cleveland office, considering the nature of the patently degrading and anti-female nature of the harassment, it stands to reason that women would suffer, as a result of the exposure, greater disadvantage in the terms and conditions of their employment than men. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (observing that the critical issue, for purposes of Title VII sexual harassment, is whether members of one sex are subject to more disadvantageous terms or conditions of employment than members of the other sex).[2]

---

[2]Granted, some women, like Gallagher's co-worker Angela Sarris, may be so calloused as to not be any more offended than some men by the explicitly sexual and blatantly anti-female conduct that permeated the Cleveland office. It appears Sarris was willing and able to participate in the offensive

The district court, in evaluating the "based on sex" element, focused too narrowly on the motivation for the harassers' offensive conduct rather than on the effects of the conduct on the victim-recipient. This very point was recently clarified by the Eleventh Circuit in *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139 (11th Cir. 2008), involving a disturbingly similar sexual harassment claim by a female employee in C.H. Robinson's Birmingham, Alabama office. The *Reeves* court reversed the lower court's grant of summary judgment to C.H. Robinson, holding that "sex specific" language satisfies the "based on sex" element even when the language does not target the plaintiff. *Id.* at 1144. The court reasoned:

> The language in the CHRW office included the "sex specific" words "bitch," "whore," and "cunt" that . . . may be more degrading to women than men. The subject matter of the conversations and jokes that allegedly permeated the office on a daily basis included male and female sexual anatomy, masturbation, and female pornography, all of which was discussed in a manner that was similarly more degrading to women than men. . . . Therefore, even if such language was used indiscriminately in the office such that men and women were equally exposed to the language, the language had a discriminatory effect on Reeves because of its degrading nature.

*Id*. This analysis is persuasive and equally applicable to the facts of this case. *See also Petrosino v. Bell Atlantic*, 385 F.3d 210, 221-23 (2d Cir. 2004) (concluding that even though both male and female employees were exposed to the same offensive circumstances, a reasonable person, regardless of gender, would consider the sexually offensive comments and graffiti more offensive to women than to men and therefore discriminatory based on sex).

In defense of the district court's ruling on this point, C.H. Robinson points to language in *Baldwin*, 480 F.3d at 1302, to the effect that an "equal opportunity curser" does not harass based on sex if members of one sex are not exposed to more disadvantageous conditions of employment than members of the other sex. Yet, the

conduct on equal terms with the male co-workers. Gallagher testified that one of the more offensive and degrading images she observed was displayed on Sarris's computer monitor. When Gallagher objected, Sarris and the others just laughed and ignored her. Apart from whether Angela Sarris is a reasonable person, we do not hesitate to hold that a reasonable jury could conclude, based on the existing record, that Gallagher experienced sex-based harassment in the workplace.

*Baldwin* court also expressly recognized that "sex specific" profanity is more degrading to women than men and is properly deemed "based on sex" for purposes of evaluating the severity and pervasiveness of the harassment. In other words, per *Baldwin*, too, a harasser whose offensive conduct afflicts both men and women is not an "equal opportunity curser" if the conduct is more offensive to women than men. *Baldwin* is thus revealed to be entirely consistent with *Reeves*.

Accordingly, we adopt the approach employed in *Reeves* and *Petrosino* and hold that the district court erred in finding the record evidence insufficient to present a triable fact issue on the "based on sex" element of the prima facie case.

### C. Severe and Pervasive

The district court also determined that the harassment was not shown to be so severe and pervasive as to interfere with Gallagher's job performance. Although the court found the evidence sufficient to create a genuine issue of fact as to whether the alleged workplace conduct was subjectively severe or pervasive to her, the court determined Gallagher could not show that it was "sufficiently objectively severe or pervasive" to withstand the motion for summary judgment. The court acknowledged its obligation to consider the totality of the circumstances, but summarized these merely as entailing "the frequent use of crude language, the occasional instances of offensive e-mails and pornographic material to which Gallagher was not intentionally exposed, and the few instances of offensive conduct directed at Gallagher." Further, the court faulted plaintiff for failing to present any evidence that the harassment interfered with her work performance. In these conclusions, the district court has made the same mistakes in evaluating the evidence as were made by the district court in *Williams v. General Motors*.

In *Williams*, the court identified the governing standard as follows:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

187 F.3d at 566 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)). The *Williams* court went on to characterize this standard as meaning that "the focus of the objective/subjective inquiry should remain on (1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct 'severe or pervasive.'" *Id.* at 568. Further, the court emphasized that this evaluation of the work environment must take into account the totality of the circumstances. *Id.* at 563. "[E]ven where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Id.* The *Williams* court reversed the award of summary judgment to the employer, holding the district court erred (1) by failing to view the workplace as a whole, (2) by placing too much weight on the fact that Williams was not physically threatened, and (3) by improperly insisting on evidence that Williams's work performance actually declined, as opposed to evidence that the harassment made it more difficult for her to do the job.

This summary of *Williams* illustrates the flaws in the district court's analysis in this case. The district court emphasized that most of the offensive conduct was not directed at Gallagher. This is not an irrelevant consideration, but the district court appears to have ignored the fact that, due to the configuration of the Cleveland workplace, it was practically impossible for Gallagher to avoid her co-workers' offensive conduct. Whether the offensive conduct was intentionally directed specifically at Gallagher or not, the fact remains that she had no means of escaping her co-workers' loud insulting language and degrading conversations; she was unavoidably exposed to it. Her complaints to co-workers and her supervisor were not only ignored, but actually tended to exacerbate the harassment.

Further, the district court erroneously insisted on a showing that the harassment was both subjectively and objectively severe and pervasive; whereas the *Williams* standard requires a showing that the environment is objectively hostile and the harassment subjectively severe and pervasive.  The district court had no trouble concluding there was a triable issue as to whether the harassment was subjectively severe and pervasive.  The next question thus should have been whether a reasonable person could have found the environment objectively hostile.  Considering the totality of the circumstances as described in Gallagher's deposition, the conclusion is inescapable that a reasonable person could have found the Cleveland office—permeated with vulgar language, demeaning conversations and images, and palpable anti-female animus—objectively hostile.  The district court reached a contrary conclusion by erroneously limiting its consideration only to some instances of abusive conduct, instead of considering the workplace as a whole.

Moreover, the district court also erred in requiring evidence that Gallagher's work performance suffered measurably as a result of the harassment.  The court placed inordinate weight on Gallagher's testimony that she was able to meet her daily and weekly quotas and that her work performance was rated average to above average.  In finding that Gallagher failed to present any evidence that the harassment unreasonably interfered with her work, the court ignored her testimony that, from day one in the Cleveland office, she was "horrified" by the loudness, constant swearing and vulgar language, and that she "left there every day crying."  Considering Gallagher's description of the offensive conduct to which she was exposed, her reaction can hardly be dismissed as implausible, unreasonable, exaggerated or hypersensitive.  Nor is it improbable that the hostility and antagonism she experienced rendered her work more difficult.  In *Williams*, the court made it clear that a plaintiff need not prove a tangible decline in her work productivity; only "that the harassment made it more difficult to do the job."  187 F.3d at 567 (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988)).  Based on the instant record, a reasonable jury could certainly find that the complained of harassment made it more difficult for Gallagher to do her job.

We therefore conclude that the district court erred in its determination that Gallagher presented insufficient evidence that she was subjected to such severe and pervasive harassment as to unreasonably interfere with her work performance and create a hostile work environment.

### D. Employer Liability

Finally, the district court concluded C.H. Robinson could not be held liable for the workplace harassment because Gallagher did not make reasonable efforts to report it to management for corrective action. The standards governing this element of the prima facie case are well-summarized in *Petrosino v. Bell Atlantic* as follows:

> The Supreme Court has ruled that employers are not automatically liable for sexual harassment perpetrated by their employees. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action. *See Faragher v. City of Boca Raton,* 524 U.S. at 789; *accord Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 72 (2d Cir.2000). Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee, *Burlington Indus., Inc. v. Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; if it did, "the employer will, *ipso facto,* be vicariously liable," *Mack v. Otis Elevator Co.,* 326 F.3d [116] at 124 [(2d Cir. 2003)]. In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *accord Faragher v. City of Boca Raton,* 524 U.S. at 807, 118 S.Ct. 2275; *Mack v. Otis Elevator Co.,* 326 F.3d at 125.

385 F.3d at 225. *See also Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir. 1999) (same).

Evaluating C.H. Robinson's liability for the offensive environment in the Cleveland office thus depends fundamentally on whether Gallagher's hostile work environment claims are based on co-worker harassment or supervisor harassment. Gallagher insists the answer is "both," and the record supports her position. Although it was Gallagher's co-workers (Bryan Starosto, Warren Liehr, David Derryberry and Brandon Rodgers) who were the perpetrators of some of the most offensive conduct, her deposition testimony demonstrates that her supervisor, branch manager Greg Quast, was present during and witnessed much of the conduct, participated in some of it, received reports from Gallagher of incidents he did not witness, and through his inaction during the four-month period, ostensibly condoned it all. In other words, both co-workers and supervisor were clearly complicit in creating and maintaining the hostile work environment. This is significant. Yet, the district court's analysis of employer liability appears to have been based on the implicit assumption that the case involved only supervisor harassment.

If this case were strictly about supervisor harassment, the district court's analysis would arguably be correct. Applying the law summarized above in *Petrosino*, it is apparent that Quast's participation in the harassment did not ripen into any tangible employment action against Gallagher, such as firing or demotion. Hence, C.H. Robinson is entitled to assert its affirmative defense, consisting of the dual showing (1) that it exercised reasonable care to prevent and correct harassing behavior and (2) that Gallagher unreasonably failed to take advantage of available opportunities to avoid harm. Generally, an employer satisfies the first part of this two-part standard when it has promulgated and enforced a sexual harassment policy. *Thornton v. Federal Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008). "[A]n effective harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training

regarding the policy." *Id.* (quoting *Clark v. United Parcel Service, Inc.,* 400 F.3d at 341, 349-50 (6th Cir. 2005)).

Gallagher does not challenge the facial adequacy of C.H. Robinson's sexual harassment policy, but maintains she reasonably tried to take advantage of it by reporting her complaints to her office manager, Greg Quast. She contends the lack of resulting corrective action demonstrates the ineffectiveness of the policy. The district court gave short shrift to this argument, noting that of the many means and opportunities available to Gallagher, she employed only one. Limiting her reports of harassment to Quast alone was clearly unreasonable, the district court found, because it had become clear to Gallagher in her first weeks on the job that Quast was part of the problem, not the solution.

Indeed, the policy expressly provides alternative avenues for reporting harassment where an employee's supervisor is involved in the harassment. Yet, despite her knowledge of the alternatives, Gallagher did not report her concerns to any other person in management. As the district court put it, "she chose, instead, to deal with the problem by leaving the company for another, higher-paying job with her previous employer." Opinion at p. 14, JA 34; *Gallagher*, 2008 WL 471693 at *7. Gallagher's decision to leave her employment with C.H. Robinson appears clearly to have been reasonable. However, her failure to take reasonable steps to ensure her employer was actually aware of the harassment and had a chance to correct it before she left undercuts her present effort to impose liability on C.H. Robinson based on Quast's supervisory complicity in the harassment. *See Thornton*, 530 F.3d at 457-58 (employer's affirmative defense deemed established on showing of effective harassment policy and showing of employee's unreasonable failure to take advantage of policy); *Deters v. Rock-Tenn Co.*, 245 F. App'x 516, 526-27 (6th Cir. 2007) (same).

Gallagher contends she refrained from using one of the alternative reporting mechanisms, the 1-800 anonymous tip reporting number, for fear of repercussions. She had heard that other employees who used it to register complaints had been fired. Yet, the record is devoid of substantiation of this hearsay. Gallagher has not adduced

evidence that she was under a "credible threat of retaliation." *See Thornton*, 530 F.3d at 457 (quoting *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1290-91 (11th Cir. 2003)). And "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Id.* (quoting *Williams v. Missouri Dep't of Mental Health*, 407 F.3d 972, 977 (8th Cir. 2005)).

For these reasons, Gallagher's claims would be vulnerable to summary judgment if they were based strictly on supervisor harassment by Quast. However, her claims are undisputedly also based on co-worker harassment. An employer is vicariously liable for co-worker harassment of which it knew or should have known if it failed to take appropriate remedial action, i.e., if its response manifests indifference or unreasonableness. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008); *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005). To establish that the employer "knew or should have known" of the co-worker harassment, the plaintiff need not necessarily have reported it to a supervisor. *Jackson v. Quanex Corp.*, 191 F.3d at 663. Where harassment is pervasive, knowledge may be imputed to the employer. *Id.*

Here, it is undisputed that Gallagher reported much of the harassing conduct to her supervisor Quast. Further, according to Gallagher's deposition testimony, Quast witnessed much of the harassing conduct and participated in some. The facts substantiate a finding the Quast knew or should have known of the offensive conduct and of Gallagher's objection to it. Yet, in the absence of evidence that this knowledge extended higher up in the chain of management, the question is whether Quast's knowledge is properly imputed to C.H. Robinson. As explained above, Quast's knowledge alone is insufficient to warrant imposing liability on C.H. Robinson for supervisor harassment, but liability for co-worker harassment is different.

An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized—or is reasonably believed by a complaining employee to have been authorized—to receive and respond to or forward such complaints to management. *Bombaci v. Journal Community Pub. Group. Inc.*, 482

F.3d 979, 984 (7th Cir. 2007).  Under C.H. Robinson's sexual harassment policy, Quast, as branch manager and Gallagher's immediate supervisor, was expressly so authorized. Hence, C.H. Robinson has not disputed the claim that Quast's knowledge of Gallagher's complaints is properly imputed to it.

Rather, C.H. Robinson argues that Gallagher's complaints to Quast were insufficient to communicate notice of sexual harassment.  It is true that Gallagher did not report all of her concerns to Quast and did not necessarily characterize all of her complaints as sexual harassment complaints.  Still, when the conduct Gallagher did report to Quast is considered alongside the pervasive conduct Quast himself witnessed, it can hardly be denied that there is a genuine fact issue as to what Quast, and therefore C.H. Robinson, knew or should have known.  *See Hawkins*, 517 F.3d at 339 (finding question of fact regarding employer's notice notwithstanding employee's failure to specifically report harassment); *Jackson*, 191 F.3d at 663 (recognizing that knowledge of pervasive harassment may be imputed to employer despite lack of report).

C.H. Robinson maintains that even if it knew or should have known of the harassment, Quast's response to Gallagher's expressed concerns was reasonable.  In this regard, Gallagher's and Quast's disparate versions about what transpired in the workplace present classic questions of fact that preclude summary judgment.  Because a reasonable jury could find that C.H. Robinson knew or should have known of the sexual harassment Gallagher experienced and yet responded with manifest indifference or unreasonably, the district court's conclusion that the premises for employer liability are lacking is erroneous.

We thus conclude that the district court's analysis of the prima facie case elements of Gallagher's hostile work environment claims is flawed in three respects.  For the reasons given above, the award of summary judgment to C.H. Robinson on the Title VII (Count I) and Ohio statutory (Count III) hostile work environment claims must be set aside.

**E. Common Law Claim for Sexual Harassment**

Count IV of the complaint sets forth a claim for failing to provide a safe work environment free from sexual harassment under *Kerans v. Porter Paint Co.*, 575 N.E.2d 428 (Ohio 1991).  The district court awarded summary judgment to C.H. Robinson for the same reasons it awarded judgment on the other hostile work environment claims.

The parties dispute the specific contours of the common law claim as defined by the Ohio case law.  *See McCombs*, 395 F.3d at 354 (recognizing that Ohio common law sexual harassment claim requires an additional showing of a "past history of sexual harassment about which the employer knew or should have known," but observing that Ohio courts have failed to reach a precise definition of "past history").  Both parties acknowledge, however, that in the main, the elements of the claim are identical to those of a Title VII hostile work environment claim.  We therefore reverse the district court's summary judgment ruling on this claim as well, because of the outstanding questions of fact identified above, without otherwise expressing any opinion on the contours or validity of Gallagher's common law claim.

## IV.  CONCLUSION

Based on the foregoing analysis, we **REVERSE** the district court's award of summary judgment and **REMAND** the matter to the district court for further proceedings on all three hostile work environment claims.