Victor DAVIS, Plaintiff–Appellant,

v.

LANDSCAPE FORMS, INC.,
Defendant–Appellee.

No. 15–1549.

United States Court of Appeals,
Sixth Circuit.

Feb. 2, 2016.

Before: SILER, GIBBONS, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.

Victor Davis, who is black, was terminated by Landscape Forms, Inc. (LFI) for falsification of a timesheet, intimidation of team members, and interference with a company investigation. Davis sued LFI for racial harassment, race discrimination, and retaliation, asserting claims under state and federal statutes. These claims are based on incidents in the workplace with racial overtones. Summary judgment was proper regarding Davis' claims under 42 U.S.C. § 1981, § 1981a, and state law, as those claims are time-barred by a contractual limitations clause. Because Davis cannot prevail on the merits of his harassment, discrimination, and retaliation claims under Title VII of the Civil Rights Act, LFI was properly granted summary judgment on those claims, too.

Davis was hired by LFI as a welder in November 2011 and was given a permanent position by James Ackley, the company's production manager, in April 2012. Davis worked in a "modular cell"—a production unit within LFI—with ten to twelve other employees. Scott Ackley, James Ackley's brother, was Davis' modular cell leader and immediate supervisor.[1]

Davis' claims center on three incidents (the "racial incidents") that occurred in July and August 2012, and on racial slurs in the workplace that occurred over an unidentified period of time. The first racial incident involved a coworker placing a banana in Davis' work boot when Davis was absent from work one day in July

---

**1.** The name "Ackley" in this opinion will refer to James Ackley. References to Scott Ackley will use his full name.

2012. Davis found the banana when he returned to work. In the second incident, a coworker wrote the word "Chiquita"—presumably a reference to the banana distributor—and the phrase "ghetto fab" on yellow tape that had been fixed onto Davis' work helmet. This incident, too, occurred in July. The third incident, which occurred on the afternoon of August 29, involved a drawing of a monkey on a white board in LFI's facility, with a caption that read "I love bananas." The drawing was erased that same afternoon. The racial slurs are discussed in more detail below, as are the dates on which Davis reported the three racial incidents.

Between April and August 2012, Davis had attendance problems at work, calling in late or absent on at least ten occasions. Davis did not explain some of these incidents. Regarding the others, Davis explained that his alarm did not go off, he overslept, he had to take care of family issues, his car broke down or was stolen, and he had to leave the state for his mother's funeral. Scott Ackley talked with Davis about his attendance in mid-August, emphasizing the importance of Davis' "being there when his team needed him." On Monday, August 27, temporary cell leader Nate Quick noticed inconsistencies in the entries on Davis' timesheet for the week beginning on the previous Monday, August 20. To record hours worked, employees would log into a computer, enter an employee number, and enter the number of hours. Davis' timesheet indicated that Davis had worked eight hours on August 21, a Tuesday on which Davis had called in absent, and six hours on August 25, a Saturday when LFI's facility was closed. Davis corrected the timesheet when Quick asked Davis about the entries. Davis maintained that another employee must have logged into the computer with Davis' employee number, intentionally entering the hours.

On Tuesday, August 28—the day after Davis' conversation with Quick—an employee told Quick that two of Davis' coworkers were looking for Davis and could not find him at his work station. When Davis returned to the work station and talked with the coworkers, the coworkers said that they no longer needed him. That same day, Davis decided to meet with Karen Phillips, LFI's "People Department Specialist," to report that he was being harassed by his coworkers. It is undisputed that Davis made only the following three allegations to Phillips on August 28, each involving recent incidents not of an overtly racial nature: a coworker sent a text message to Davis' girlfriend on August 23 stating that Davis was not at work; an unidentified coworker entered hours on Davis' timesheet for the week of August 20, in an attempt to have Davis fired; and coworkers falsely told Quick on August 28 that they needed Davis' help when Davis was away from his work station.

On August 29, Phillips and Ackley convened a follow-up meeting with Davis to confirm his complaints. There is a dispute as to whether Davis also complained about the three racial incidents—the banana, work-helmet, and monkey-drawing incidents—during the August 29 meeting or during a later meeting on September 10. Davis testified that he reported the three racial incidents during the August 29 meeting. However, because the monkey-drawing incident occurred after Davis left the meeting with Phillips and Ackley, Davis cannot have reported that incident at the August 29 meeting. In contrast to Davis' testimony, Ackley testified that Davis reported the three racial incidents for the first time in the September 10 meeting. Ackley's testimony is corroborated by Phillips' and Ackley's notes documenting the August 29 meeting, which indicate that Davis asked them to investigate

only the text message, timesheet, and workstation incidents at that time. The parties agree that Davis did not tell Phillips or Ackley about hearing racial slurs in the workplace until the September 10 meeting.

After the August 29 meeting, Phillips and Ackley investigated Davis' text message, timesheet, and work-station complaints by interviewing five employees. As for the text message incident, Ryan Rackley—one of the members of Davis' modular cell—admitted that he and another coworker, Cornelius Van Wezema, sent the text message to Davis' girlfriend. Rackley and Van Wezema said that they believed that the phone number belonged to Davis. Ackley also investigated the second issue, the entries on Davis' timesheet, by examining when and how Davis typically recorded hours. Based on Ackley's conversations with Davis and an IT employee, Ackley concluded that on Monday, August 27, Davis intentionally entered hours for time that he had not worked. Regarding the third issue of coworkers accusing Davis of not being at his work station, several employees told Ackley that Davis was frequently away from his work station. Employees also told Ackley that Davis "specifically told people to not talk to [Ackley] about anything when [Ackley] came around" to investigate. Davis denied saying this. Due to the allegations that Davis had interfered with the investigation, Ackley suspended Davis with pay on August 29, the same day that Ackley began investigating Davis' complaints.

Ackley's investigation after the August 29 meeting also revealed other information related to Davis' work history. Several employees reported hearing Davis say that he was going to get Rackley fired from LFI. Others reported that Davis would often work slowly on purpose and would leave the work area in an attempt to make overtime work necessary. One employee alleged that Davis once told him to report more hours than the employee had worked. That employee also said that Davis told him not to talk to Ackley, and that Davis added that the employee was "lucky [Davis was] still on parole."

On September 10, 2012—approximately two weeks after Davis told Phillips and Ackley about the text message, timesheet, and work-station incidents—Davis met with them again to discuss the results of the investigation. LFI shared what it had found concerning the text message and Davis being away from the work station. LFI maintains that it was during this meeting that Davis first reported the three racial incidents involving the banana, work helmet, and monkey drawing. Whatever the timing of the reports of those three incidents, it is undisputed that Davis reported hearing racial slurs in the workplace for the first time at this meeting. In describing the racial slurs, Davis did not provide detail, stating that "[h]e thought he heard it in the background." Davis has never claimed that he told Ackley who made racial slurs or what was said. Davis' testimony, however, provides a more detailed account of the slurs. According to Davis, the slurs included Rackley and others using the word "nigger" on multiple occasions to refer to Davis, Rackley asking Davis at one point whether Davis "had a tail," and Rackley calling Davis a "porch monkey."

Immediately after the September 10 meeting, on September 11 and 12, Ackley interviewed ten additional employees to inquire about the three racial allegations. Although Adam Reed admitted that he put the banana in Davis' boot in July 2012, Reed said that he did this as a joke and that Davis laughed about it at the time. As for the work-helmet incident, Reed and

Justen Marsh explained that Davis put the yellow tape on his own helmet, that Marsh wrote the words "Chiquita" and "ghetto fab" on the tape, and that Davis laughed about the words and wore the helmet for several weeks before removing the tape. Concerning the third incident, Josh Miller admitted that on August 29, he drew the monkey picture and wrote "I love bananas" as a caption. Ackley did not ask the interviewees whether they had heard racial slurs at work. One week after the investigation, Ackley disciplined Reed, Marsh, and Miller by causing them to forfeit their third-quarter bonuses, which typically amounted to "several thousand dollars."

On September 17, 2012, about a week after Ackley finished investigating all of Davis' allegations, LFI terminated Davis' employment. The notice of termination stated that Davis was terminated based on information revealed during Ackley's interviews with fourteen employees. The notice explained:

— During the course of the investigation, you intimidated fellow team members, threatened them, and told them not to speak with me. In addition, you threatened to have team members fired. Intimidating fellow team members and interfering with a company investigation is each an independent basis that warrants discharge.

— You falsified your time records.... At no time during the course of the investigation did you tell the truth as to what had occurred with respect to your time records. Falsification of your time records is a dischargeable offense.

— You were less than truthful in your discussions with regard to some of the above issues and how much you knew about them....

— At no time during the course of the investigation did you accept accountabili-

ty for any of your actions, nor did you indicate that you would correct your behavior.

The letter also explained how Davis' conduct related to the conduct of his co-workers:

We will take the appropriate disciplinary action with respect to each team member who was involved in th[e inappropriate] conduct. We have concluded, however, that although this inappropriate conduct occurred, it does not mitigate against our decision to discharge you. We can see no connection between the team members' inappropriate actions and the conduct that we have described above that forms the basis to terminate your employment.

Davis filed suit in federal court in December 2013, asserting one count of racial harassment based on a hostile work environment, and one count of race-based discrimination and retaliation. Davis asserted these claims under 42 U.S.C. § 1981, 42 U.S.C. § 1981a, Michigan's Elliott–Larsen Civil Rights Act (ELCRA), M.C.L. § 37.2101 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The district court granted summary judgment to LFI on all claims. The court reasoned that the § 1981, § 1981a, and ELCRA claims (the "non-Title VII claims") were barred by a clause in Davis' employment application. That clause provides that claims that do not require a right-to-sue notice from the EEOC—such as the non-Title VII claims here—must be brought "within ... 180 days of the event(s) giving rise to the claim[s]." According to the district court, the non-Title VII claims were time-barred because they were brought outside of the 180–day period.

The district court also addressed the merits of the Title VII claims. Concerning the racial-harassment claim, the court held

that LFI did not act negligently in response to Davis' complaints. The district court also held that Davis could not establish a prima facie case of race discrimination, reasoning that there was no evidence that similarly-situated white employees were treated more favorably than Davis. Lastly, the court explained that Davis could not prove that the reasons for his termination were pretexts for discrimination, and that this fact defeated his retaliation claim. In this part of the analysis, the court also held inadmissible a statistical report on the number of black employees at LFI.

## I.

■ Because Michigan law requires courts to enforce contractually-shortened limitations periods like the one in Davis' employment application and because the non-Title VII claims were filed outside the relevant limitations period, LFI was entitled to summary judgment on those claims. Given this conclusion, we need not decide whether Davis abandoned his arguments regarding this issue.

The limitations clause in Davis' employment application is enforceable because it does not violate law or public policy. State contract law governs the enforceability of contracts. *Cf. Hergenreder v. Bickford Senior Living Grp.,* 656 F.3d 411, 416 (6th Cir.2011) (citation omitted). In Michigan, "unambiguous contracts ... are to be enforced as written unless a contractual provision violates law or public policy."[2] *Rory v. Cont'l Ins. Co.,* 473 Mich. 457, 703 N.W.2d 23, 43 (2005). Public policy includes the policy embodied in "traditional contract defenses, such as fraud, duress, unconscionability, or waiver." *Id.* at 41–42. Davis has not argued that the clause at issue here violates Michigan law or public policy. Although he argues that the clause violates federal law and policy, that argument is without merit. Enforcing the clause would not "violate" the four-year statute of limitations in 28 U.S.C. § 1658 that generally applies to claims under 42 U.S.C. § 1981 and § 1981a. The clause in Davis' employment application represents an agreement that the four-year default rule does not apply. Nor does this case involve the use of a state statute of limitations to bar Davis' federal-law claims, which might otherwise be inconsistent with 28 U.S.C. § 1658 and the policy underlying the federal civil-rights statutes. Davis has thus identified no law or public policy that precludes enforcement of the clause. Accordingly, because Davis brought the non-Title VII claims in December 2013, which is more than 180 days after the events in August and September 2012 that gave rise to this lawsuit, the non-Title VII claims are time-barred.

## II.

LFI was also properly granted summary judgment on Davis' hostile work environment, race discrimination, and retaliation claims under Title VII. Davis cannot establish one element of a prima facie hostile work environment case—that the employer, LFI, is liable for the harassment. As for the race discrimination and retaliation

---

**2.** In *Thurman v. DaimlerChrysler, Inc.,* 397 F.3d 352, 357 (6th Cir.2004), a decision preceding the Michigan Supreme Court's *Rory* decision, we noted that Michigan courts applied a "reasonableness" standard to contractually-shortened limitations periods. In 2005, however, *Rory* rejected the reasonableness standard, holding that law and public policy provide the only bases for invalidating a clause in a contract. 703 N.W.2d at 43. Although the district court in this case applied the reasonableness standard to the clause in Davis' employment application, we reach the same result as the district court by applying *Rory*'s analysis.

claims, even assuming that Davis can prove a prima facie case for each claim, he cannot prove that LFI's reasons for terminating him were pretexts for discrimination.

### a.

■ LFI responded in neither an indifferent nor an unreasonable manner to Davis' allegations of racial harassment. This prevents Davis from establishing employer liability, the fifth element of a hostile work environment claim. To prove such a claim, a plaintiff must show that: "(1) [he] was a member of a protected class; (2) [he] was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with [his] work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir.2009) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir.1999)). We assume without deciding that a jury could find for Davis on the first four elements of this claim, and therefore address only employer liability. To prove employer liability based on the actions of coworkers as opposed to the actions of supervisors, a plaintiff must demonstrate that the employer "knew or should have known of the charged [racial] harassment and failed to implement prompt and appropriate corrective action." *Id.* at 516 (alteration in original) (quoting *Hafford*, 183 F.3d at 513).

LFI became aware of several of the racial incidents on August 29, 2012, at the earliest, and the company took prompt and appropriate remedial action in less than three weeks. As an initial matter, Davis'

testimony that he reported all three racial incidents on August 29 is internally inconsistent—Davis also testified that he learned of the monkey-drawing incident only after leaving the August 29 meeting—and conflicts with the rest of the record. Viewing the facts in the light most favorable to Davis, however, LFI received notice of the banana and work-helmet incidents on August 29, over a month after the incidents occurred. Within two weeks of Davis' report, on September 11 and 12, Ackley interviewed ten employees to inquire about Davis' allegations. These interviews revealed that three of Davis' coworkers—Reed, Marsh, and Miller—were responsible for the banana, work-helmet, and monkey-drawing incidents. About a week after the interviews, LFI disciplined these employees by denying them a third-quarter bonus, which was the largest bonus of the year. Following LFI's discipline of the three employees, moreover, the company held a "Respect Review & Training" session on October 2, 2012, presumably to address racial issues within the company. On this record, LFI took prompt and appropriate corrective action in response to Davis' report of the three racial incidents.

Similarly, LFI did not act unreasonably by failing to investigate Davis' vague allegation—first made on September 10—that "[h]e thought he heard [racial comments] in the background." Given the company's prompt remedial actions regarding the banana, work-helmet, and monkey-drawing incidents, the failure to investigate racial slurs appears to form the crux of Davis' harassment claim.[3] However, Davis' vague comment that he had heard racial slurs "in the background" did not put LFI

---

3. At oral argument, Davis' counsel focused primarily on LFI's failure to interview employees about the racial comments that Davis reported hearing. Oral Argument at 1:02, *Davis v. Landscape Forms, Inc.*, (No. 15–1549), *available at* http://www.ca6.uscourts.gov/internet/court_audio/aud1.php.

on notice as to any specific instances of racial harassment. An employer has a duty to take prompt and appropriate remedial action in response to complaints of racial harassment, *see Barrett*, 556 F.3d at 516 (citation omitted), and this duty presupposes that the employer is given enough information to take such action. In this case, no evidence indicates that Davis ever told Phillips or Ackley who said the slurs that Davis heard in the background, what was said, or when this occurred. Proving employer liability requires indifference or unreasonableness by the employer. *See Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 276 (6th Cir.2009) (citation omitted). In light of LFI's investigation of the three racial incidents and the dearth of information provided by Davis regarding racial comments in the workplace, LFI's failure to investigate one allegation of racial murmuring is too thin a reed on which to premise employer liability.

This conclusion is confirmed by several of our decisions that address the degree of specificity required in a Title VII plaintiff's racial-harassment complaint. In one case, for instance, we reasoned that a plaintiff's failure to "offer specific incidents—dates, times, full descriptions—of racially-based harassment" precluded a finding of a racially hostile work environment in the absence of direct evidence of discrimination. *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 Fed. Appx. 620, 626 (6th Cir.2010) (citing *Hafford*, 183 F.3d at 512). That reasoning applies with equal force to Davis' allegation concerning racial comments. By contrast, in *Barrett*, we reasoned that a plaintiff could establish employer liability because "she reported nearly all of the relevant incidents involving co-worker harassment to one of two supervisors ... and they failed to take corrective action." 556 F.3d at 519–20. Similarly, in *Hafford*,

we also held that employer liability was a jury question, noting that the plaintiff had made multiple written reports about racial slurs and that management did not investigate the reports. 183 F.3d at 513–14. In contrast to this case, the plaintiff in *Hafford* gave the company actionable information, identifying what was said in each instance and in some cases who was responsible for the harassment. *Id.* at 509–10. In sum, our decisions indicate that in the context of coworker harassment, employees must give employers information that allows the employer to investigate and take remedial action. Davis did not do so here.

Our conclusion is not altered by the fact that two LFI employees—Phil Garcia, a former employee with a Hispanic background, and Dan Thurmond, a former employee who is black—also allegedly experienced racial harassment in the workplace. Thurmond's affidavit indicates that, among other incidents at LFI, Marsh said to Thurmond in April 2012 "fucking monkey, dance." In the spring of 2012, Rackley and perhaps others also used slurs including "spic," "wetback," and "fucking Mexican" around Garcia. As we have previously recognized, "offensive comments need not be directed at a plaintiff in order to constitute conduct violating Title VII." *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir.1999) (citation omitted). Even so, the earlier events involving Garcia and Thurmond do not allow Davis to prove employer liability. In April and May 2012, Ackley talked with those responsible for the comments directed at Garcia, and led a training session on racism and respect. Nothing suggests that between that time and September 2012, LFI was on notice of slurs directed at or heard by Davis. In any event, Davis faults LFI primarily for failing to investigate his September 10 allegation, not for failing to adequately in-

vestigate the earlier incidents with different employees. As explained above, in light of LFI's investigation of the three racial incidents and the discipline that the company meted out, the company did not act unreasonably by failing to ask employees about racial slurs.

### b.

■ Davis' race discrimination claim—which asserts that Davis was treated worse than white coworkers and that this led to his termination—is likewise without merit. Even assuming that Davis can prove a prima facie case, he has not offered sufficient evidence that LFI's reasons for terminating him were pretexts for discrimination.

A burden-shifting framework applies in cases like this one that involve circumstantial evidence of discrimination. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir.2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Assuming that Davis can prove the first step, a prima facie case of race discrimination, LFI has satisfied the second step of the framework by providing multiple legitimate, non-discriminatory reasons for terminating Davis, including falsification of a timesheet, interference with a company investigation, and intimidation of team members. Davis' claim falls short at the third step of the framework, which requires a Title VII plaintiff to prove that the reasons for his termination are pretexts for discrimination. "Plaintiffs may establish pretext by showing that the proffered reason (1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir.2009) (citation and internal quotation marks omitted). Davis attempts to prove pretext primarily by asserting that LFI's reasons are false or had no factual basis, and by pointing to a statistical report on the number of black employees at LFI. None of Davis' arguments requires submitting the question of pretext to a jury.

On September 17, 2012—the date of Davis' termination—LFI reasonably and honestly believed that Davis had engaged in conduct meriting termination, a fact that triggers the "honest belief rule" and prevents Davis from proving pretext. Under this rule, an "employee cannot establish that [a] reason was pretextual simply because it is ultimately shown to be incorrect." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 728 (6th Cir.2008) (citation omitted). "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citation omitted). In this case, LFI reasonably believed that Davis had interfered with the investigation of Davis' complaints involving the text message, the timesheet, and Davis' work station, and that Davis had intimidated coworkers during the investigation. According to company policy, both interference and intimidation are dischargeable offenses. Ackley's conclusion that Davis committed misconduct in this way was based on statements by employees Van Wezema, Rackley, Matt Ernsberger, Aaron Klok, and Jeremy Goodale. According to Ernsberger, for instance, Davis told coworkers not to talk to Ackley during the investigation, told coworkers to "stay out of it," told coworkers that Davis wanted Rackley out of the company, and said that the coworkers were lucky that Davis was still on parole. These particularized facts provided a basis for Ackley to believe that Davis was intimidating employees and interfering with the company's

investigation. Moreover, because Davis had had attendance issues in the past, Ackley may have believed that Davis was trying to cover up problems related to his attendance by telling coworkers to stay out of the investigation. Ackley's belief that Davis committed misconduct related to the investigation, then, was reasonable and in good faith.

Davis argues that he did not threaten coworkers and that he gave them only friendly advice to stay out of a complicated matter. These arguments do not, however, undermine Ackley's belief in September 2012 that Davis had interfered with the investigation and intimidated team members. Nor do Davis' citations to the record prove that during the investigation Ackley had reason to doubt the truth of the interviewees' statements regarding Davis' actions. "An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question...." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir.2012) (citation omitted). Under this principle and the facts of this case, Ackley's decisional process was adequate.

Ackley's investigation of Davis' timesheet entries also triggers the honest belief rule. In addition to interference with an investigation and intimidation of coworkers, LFI's notice of termination stated that Davis had falsified a timesheet by entering hours for August 21 and 25. No evidence besides Davis' own testimony indicates that Ackley's conclusion was in bad faith or was not based on sufficient facts. After being alerted to the inconsistencies in Davis' timesheet by Nate Quick on Monday, August 27, Ackley talked with Davis about how Davis typically entered work hours. According to Ackley's testimony, Davis told Ackley that he had logged into a computer before 6:00 A.M. on August 27 to close his hours for the previous week. After talking with Davis, Ackley contacted Michael Markel, an IT employee, to determine when the hours for August 21 and 25 were entered. Markel determined that someone using Davis' employee identification number entered those hours at 5:44 A.M. on August 27, before closing the hours for the previous week. This confirmed Ackley's suspicion that Davis had entered the hours. Also supporting this suspicion were Ackley's interviews on September 11 and 12 with several employees, three of whom stated that Davis had previously recorded time that he did not work or that Davis sometimes attempted to work more slowly to make overtime necessary. These statements gave Ackley a sound basis for believing that Davis had entered the hours.

None of Davis' arguments to the contrary is persuasive. First, an affidavit from a former employee, Jeremy Goodale, does not undermine the honest belief rule. The affidavit alleges that Rackley told Goodale in 2013 "[i]f you don't watch it, I'll enter your hours in wrong to get you fired, just like I did [to] Victor [Davis]." Even if Rackley was not joking when he said this, a question that the affidavit leaves open, no evidence suggests that Ackley knew that Rackley had fraudulently entered Davis' hours. Second, Davis argues that it is "just not believable" that he would have entered time for days that he did not work and that doing so would be "incredibly stupid." However, Ackley testified that his investigation led him to believe that Davis had entered the hours, and entering hours in this way is not so far outside the realm of possibility that Ackley's conclusion was in bad faith. Third, Davis faults Ackley for not asking other employees whether they had entered the hours. An employer's investigation, however, does not have to be perfect or exhaust all possibilities. *See Smith v. Chrysler Corp.*, 155

F.3d, 799 807 (6th Cir.1998). Fourth, Davis asserts that Ackley falsely testified that Davis told Ackley that he logged into a computer before 6:00 A.M. on August 27, and that this defeats the honest belief rule. Under Davis' reasoning, because Davis did not tell Ackley that Davis closed out his hours for the previous week on August 27, nothing links Davis to the 5:44 A.M. timestamp for the inputted hours. It is true that Davis testified that he never told Ackley that he logged into the computer on August 27. Even so, this testimony does not create a genuine issue of material fact. In determining that Davis falsified the hours, Ackley could have relied on statements by Davis' coworkers about Davis' work record, Davis' attempts to interfere with the investigation, and Davis' ten absences—some of which were unexplained—between April and August 2012. In any event, even if this reason for Davis' termination is not based on overwhelming evidence, it is clear that the company also had two independently-sufficient reasons—interference with an investigation and intimidation—to terminate Davis.

■ The other major issue related to pretext concerns a statistical report from Dr. Nitin Paranjpe, which shows that LFI has historically employed few blacks. Because the district court did not abuse its discretion in holding that the report was not admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the report cannot support a finding of pretext. *See Tompkin v. Philip Morris USA, Inc.,* 362 F.3d 882, 897 (6th Cir.2004) (stating scope of review for evidentiary rulings). The district court based its evidentiary ruling on the fact that Dr. Paranjpe's report compares only the number of blacks employed by LFI with the number of blacks in Kalamazoo County, Michigan. Several cases support the conclusion that

the district court did not abuse its discretion. In *Smith v. Leggett Wire Co.,* a case involving an allegedly discriminatory termination, we held that statistics regarding the percentage of minority supervisors at the defendant's facilities could not establish pretext. 220 F.3d 752, 761–62 (6th Cir.2000). We reasoned that the report "did not establish the number of qualified minorities available in each labor market" and that the percentage of minority supervisors was "not relevant to the issue of whether [the defendant] *terminated* [the plaintiff] because of his race." *Id.* (emphasis added). *Smith*'s reasoning applies here: Dr. Paranjpe's report does not show how many qualified black welders were in the relevant labor market, and the report's statistics related to hiring may have little bearing on Davis' claim based on discriminatory termination. Other courts have also concluded that a statistical report's failure to account for explanatory variables may make admissibility an uphill battle. *See, e.g., Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940, 942 (7th Cir.1997). Further supporting the district court's conclusion is a statement in a Supreme Court decision, *Watson v. Fort Worth Bank & Trust,* which provides that statistics may "be of little probative value" if "based on an applicant pool containing individuals lacking minimal qualifications for the job." 487 U.S. 977, 997, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). The district court's exclusion of Dr. Paranjpe's report was thus well within the court's discretion.

*Hopson v. DaimlerChrysler Corp.,* 306 F.3d 427 (6th Cir.2002), is not to the contrary. In that case, which involved discriminatory promotion practices, the plaintiff presented statistical evidence that 34.8% of a company's security guards were black and that only 18.5% of the supervisors and managers were black. *Id.* at 431. We held that this evidence demonstrated pretext when combined with "independent

circumstantial evidence," reasoning that "the plaintiff has met his burden of demonstrating that the statistical disparity is more likely than not due to the defendant's bias." *Id.* at 437–38. The "independent circumstantial evidence" of pretext in *Hopson* consisted in part of testimony by a company manager that the plaintiff's "race was a factor in the company's decisions not to hire him for the jobs for which he applied." *Id.* at 437. Here, in contrast to *Hopson,* Davis has not provided persuasive circumstantial evidence of pretext in addition to statistics. *Hopson* does not govern this case.

### c.

 The same reasons given in the pretext analysis above apply equally to Davis' retaliation claim, such that this claim, too, falls short. We assume that the temporal proximity between Davis' reports of racial harassment and his termination allows Davis to prove a prima facie retaliation case. Even so, temporal proximity alone is not sufficient to prove pretext. *Seeger,* 681 F.3d at 285 (citation omitted). As explained above, Davis cannot prove pretext.

### III.

The judgment of the district court is affirmed.