**IN RE: Jason Allen THOMPSON and Wendy Sue Thompson, Debtors.**

**William Duley, et al., Plaintiffs,**

v.

**Jason Allen Thompson, et al., Defendants.**

Case No. 12–56857
Adv. Pro. No. 12–2474

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Signed March 31, 2015

Ernest D. Ducey, Toledo, OH, Patrick D. Hendershott, Law Office of Patrick D. Hendershott LLC, Perrysburg, OH, for Plaintiffs.

Michael A. Cox, Matthew T. Schaeffer, Columbus, OH, for Debtors.

*MEMORANDUM OPINION AND OR-DER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDG-MENT*

John E. Hoffman, Jr., United States Bankruptcy Judge

### I. Introduction

The plaintiffs, William Duley and Jack Lilley, are co-executors of the probate estate of Laura May Debolt. They allege that Wendy and Jason Thompson, the defendants and the debtors in the underlying Chapter 7 case,[1] unlawfully disposed of assets of, and embezzled funds from, Ms. Debolt's trust, and wrongfully converted property belonging to Ms. Debolt to their own use. They sued the Debtors in state court, seeking an order removing Wendy as a co-trustee of the trust and requiring the Debtors to provide an accounting of all trust funds collected, deposited, withdrawn or expended for any purpose. The Plaintiffs also sought a judgment for the total amount of assets of the trust that were wrongfully withheld, transferred or expended. The state court granted default

---

**1.** For ease of reference, the Court will refer to the Thompsons individually by first name and collectively as the "Debtors." The Court adopts the same convention for the plaintiffs, referring to Mr. Duley and Mr. Lilley individually by their first names and to them collectively as the "Plaintiffs."

judgment, enjoined the Debtors from disposing of certain property, and removed Wendy as a cotrustee of the trust. Later, following a damages hearing, the state court granted a money judgment against the Debtors, jointly and severally, for $107,271.76 plus interest. After the Debtors filed their Chapter 7 bankruptcy case, the Plaintiffs commenced this adversary proceeding, in which they seek a judgment denying the Debtors' discharge and finding the debt arising from the state court judgment to be non-dischargeable.[2] Asserting the collateral-estoppel effect of the state court's judgment, the Plaintiffs filed a motion for partial summary judgment against the Debtors ("Motion") (Doc. 28), seeking judgment only as to the claims asserted under § 523. The Debtors filed a response in opposition to the Motion ("Response") (Doc. 29), and the Plaintiffs filed a reply ("Reply") (Doc. 30). For the reasons set forth below, the Court concludes that the state court's judgment on which the Plaintiffs rely lacks the detailed findings necessary to support the application of the doctrine of issue preclusion in this adversary proceeding. Accordingly, Plaintiffs are not entitled to partial summary judgment.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2)(I).

## III. Procedural and Factual Background

Ms. Debolt, Wendy's great aunt, was in her late 80s in 2006 when the series of events giving rise to this dispute began to unfold. At some unknown point, but presumably in 2006, the Debtors went to live with Ms. Debolt at her property in rural Union County, Ohio. On February 22, 2006, Ms. Debolt executed a power of attorney naming Wendy as her attorney in fact.[3] The power of attorney gave Wendy broad authority to, among other things, dispose of property, collect debts, endorse and cash checks, deposit money, open and close accounts and certificates of deposit, transfer assets into or out of any living trust established in Ms. Debolt's name, manage investment accounts, prepare tax returns, register or transfer automobile titles, seek government financial assistance and make gifts, provided that all business transacted under the power of attorney was transacted in Ms. Debolt's name. Compl., Ex. F.

On September 28, 2006, Ms. Debolt executed a quitclaim deed to the Debtors transferring her home and adjacent property to them. Ms. Debolt reserved a life

---

**2.** The adversary proceeding was initiated by the filing of a complaint ("Complaint") (Doc. 1) seeking a determination that the debt based on the state court judgment is nondischargeable under 11 U.S.C. §§ 523(a)(2), (a)(4) and (a)(6). As stated above, the Plaintiffs also assert objections to the Debtors' discharge based on 11 U.S.C. § 727(a)(2)(A) and (B), (a)(3), (a)(4)(A) and (B), and (a)(5). Further, invoking Ohio's fraudulent transfer statute (Ohio Revised Code §§ 1336.01–1336.11), the Plaintiffs also seek a judgment avoiding an alleged fraudulent transfer of certain real property by the Debtors to Ray M. Risner and Kay F. Risner.

**3.** The Debtors' amended answer (Doc. 22) and Response assert that there was both a prior and subsequent power of attorney executed. Copies of these other powers of attorney were not supplied to the Court, but there appears to be no dispute that, during the time in question, Wendy had either sole authority under the power of attorney, or briefly shared the power with an aunt, Audra Lilley, as to whom Ms. Debolt later revoked the power of attorney.

estate in the property for herself. Less than two months later, on November 16, 2006, Ms. Debolt executed a declaration of trust and certificate of trustee authority and power, thereby creating the Laura May Debolt Trust ("Trust"). Compl., Ex. A. At the same time, she executed a last will and testament ("Will"). Compl., Ex. D.

Ms. Debolt was the primary trustee and beneficiary of the Trust, with exclusive rights to the use and benefit of the income and assets of the Trust during her lifetime. Compl., Ex. A at 1–2. She had sole power to exercise dominion and control over the Trust assets. *Id.* at 1. She named Wendy and William, the husband of another of her nieces, as successor co-trustees, to assume the duties as trustee in the event of Ms. Debolt's resignation, death, disappearance or incompetency. *Id.* The Will named William and Jack—the husband of Wendy's aunt, Audra Lilley—as co-personal representatives of her estate.[4] The Will provided that, upon her death, Ms. Debolt's assets were to pass to the Trust. Compl., Ex. D at 1. The Trust provided that the Debtors, William and his wife, the Lilleys and others were to be distributees of the Trust's assets. Compl., Ex. A–1b.

In the nearly three years that elapsed between the time that Ms. Debolt executed the power of attorney and her death in January 2009, Wendy used her authority under the power of attorney to make purchases, pay bills, write checks and engage in various banking transactions. The Debtors assert that at all times prior to her death, Ms. Debolt was of sound mind, stayed informed of her financial affairs through constant review of financial statements, and acted under the advice of experienced estate planning counsel. Am. Answer, Doc. 22, ¶ 59–60. According to the Debtors, they "at all times acted under the authority of [Ms.] Debolt and with [her] informed consent...." *Id.* ¶ 60.

## A. The State Court Proceedings

In March 2009, William and Wendy accepted their appointments as successor co-trustees of the Trust. Compl., Ex. E. Less than a year later, William and Jack filed a complaint ("State Court Complaint") (Mot., Ex. 5) in the Union County, Ohio, Court of Common Pleas, initiating the state court lawsuit ("State Court Action"). In the State Court Complaint's prayer for relief the Plaintiffs requested an order requiring the Debtors to provide an accounting, along with all supporting documentation, of all Trust funds that had been collected, deposited, withdrawn or expended for any and all purposes under Wendy's power of attorney; for an order removing Wendy as co-trustee of the Trust; and for judgment in the total amount of assets that the Defendants wrongfully withheld, transferred or expended.

On March 24, 2010, Plaintiffs filed a motion for default judgment. Less than a month later the state court granted the motion by way of a judgment entry and order ("Default Judgment Order")[5] that stated, in its entirety, as follows:

---

4. The Will named Claude Laird as personal representative of Ms. Debolt's estate, with William and Jack to act as co-personal representatives if Claude was unwilling or unable to act. Compl., Ex. D at 3. The summary judgment record is silent as to the circumstances that led to William and Jack becoming co-executors of the estate in place of Claude.

5. The Motion asserts that the Debtors failed to file an answer to the State Court Complaint, Mot. at 5, and the Default Judgment Order stated that they were in default. Yet a copy of the state court docket supplied by the Plaintiffs ("Docket") (Mot., Ex. 2) reflects that on April 20, 2010, two days prior to the entry of the Default Judgment Order, there was a "Response to Motion for Default Judgment &

This matter is before the Court on the Motion for Default Judgment filed by the Plaintiff seeking judgment upon the Complaint for an Accounting, an Injunction for the Removal of a Co–Trustee, and for Damages.

The Court finds that all necessary parties have been properly served, are properly before the court, and that Defendants Wendy S. Thompson, as Successor Co–Trustee for the Laura May Debolt Trust, and Jason A. Thompson, are in default of Motion for Answer under Civil Rule 55(A). The court further finds that it has jurisdiction over this matter, and that Defendants are not in military service. Plaintiffs' motion is therefore well-taken and is GRANTED.

IT IS THEREFORE ORDERED that Wendy S. Thompson is removed as Co–Trustee of the Laura May Debolt Trust, leaving William Duley as the sole trustee of the Laura May Debolt Trust.

IT IS FURTHER ORDERED that a hearing on the issue of damages be held on the 27th day of May, 2010 at 10:30 a.m. in the Union County Court of Common Pleas Courtroom.

Compl., Ex. R.

Following the May 27 hearing, the state court entered the following two-paragraph Judgment Order and Entry ("Injunction Entry"):

> This matter came on for a hearing in open court on May 27, 2010 on the Plaintiff's Motion as orally amended for an Injunction and Temporary Restraining Order pursuant to R.C. 1336.04 and under Civ. R. 65. The Plaintiff's Motion is well-taken and is SUSTAINED.

IT IS THEREFORE ORDERED that Wendy S. Thompson and Jason A. Thompson are restrained and enjoined from liquidating, transferring and alienating the real property and personal property situated at 23942 St. Rt. 31, Raymond Ohio 43067 in Union County, Ohio.

Compl., Ex. U. The Injunction Entry included no factual findings. No copy of a motion for injunction and temporary restraining order has been provided to this Court, nor have the Plaintiffs supplied a copy of the transcript (if one exists) recording the oral amendment to the motion for default judgment. The only references to an injunction in the State Court Complaint were in the title, i.e., "Complaint for Accounting, Injunction for Removal of Co–Trustee, and for Damages," and in paragraph 2 under the heading "Jurisdiction and Venue," which reads "[t]his is also an action for the removal of the Defendant Wendy S. Thompson as the Successor Co–Trustee of the Laura May Debolt Trust, as the Defendant must be enjoined from further acts as a fiduciary of the Laura May Debolt Trust, based upon the facts that reveal fraud and that are alleged with particularity herein." State Ct. Compl. at 2.

On September 14, 2010, the Union County Court of Common Pleas issued the second judgment entry ("Final Judgment Entry") (Compl., Ex. V) that followed from the May 27 damages hearing. The Final Judgment Entry recited that the Plaintiffs had appeared and presented evidence through counsel; that Jason had appeared pro se, but had presented no evidence;[6] and that Wendy had not appeared. Final

---

Answer filed." Thus, it appears that the Debtors actually may not have been in default at the time the Default Judgment Order was entered by the state court.

6. According to the Debtors, Jason was not permitted to present evidence at the hearing because the state court judge advised him that liability already had been established by the Default Judgment Order. Resp. at 8.

J. Entry at 1. The Final Judgment Entry recites that the Plaintiffs and Wendy each filed written closing arguments. *Id.* Under the Final Judgment Entry, the state court granted judgment against the Debtors, jointly and severally, in the amount of $107,271.76 plus interest at the statutory rate of 4% per annum from the date it was entered. Final J. Entry at 5. The Final Judgment Entry states that the court's findings are based "[u]pon thorough examination of the testimony and evidence as presented and admitted during the damages hearing," and "upon the analysis set forth in the spreadsheet attached hereto as Exhibit A[.]" *Id.* at 1.

According to the Docket, following issuance of the Final Judgment Entry, the Debtors filed both a motion to appeal and an appeal itself, which was subsequently dismissed. The Plaintiffs then filed for a writ of execution and noticed depositions of both Wendy and Jason in aid of execution. In response, the Debtors filed a request for hearing and a motion to quash the writ of execution. They also filed a motion for relief from judgment and sought leave to file a memorandum containing supplemental authority in support of their motion to quash. After briefing by both sides, the state court magistrate issued a decision and recommendation to which the Debtors filed objections. Eventually, on September 20, 2011, the parties filed an agreed entry on the motion to quash the writ of execution. Less than a year later—on August 9, 2012—the Debtors filed their bankruptcy petition.

### 1. The State Court Complaint

The State Court Complaint contains two counts. Count I is entitled "Breach of Confidential Fiduciary Relationship; Failure to Render Accounting as Co–Trustee." State Ct. Compl. at 3. Count II is entitled "Breach of Confidential Fiduciary Rela-

tionship; Defendant Depleted Trust for Personal Gain." *Id.* In Count I of the State Court Complaint the Plaintiffs allege that Wendy failed to assist fully in creating a complete accounting of the assets of the Trust as required by her duties as a co-trustee of the Trust. *Id.* ¶ 18. The Plaintiffs further allege that the accounts provided by Wendy were incomplete, that the co-executors of the estate could not generate a full accounting without the information withheld by her, and that Wendy was unable to provide a full accounting of Trust assets due to "fraudulent acts and wrongful conversion of trust assets." *Id.* ¶¶ 18–19. Specifically, after stating that the successor trustees were required to make an accounting to all remainder beneficiaries of the net proceeds of the Trust, Plaintiffs allege that "[t]he Defendant has failed to assist fully in creating such a complete account; accounts that were provided are seriously inadequate." *Id.* ¶ 18–19. They also assert that "[t]he Plaintiffs cannot generate a full accounting without the information that is being withheld by the Defendant," and that "[u]pon information and belief, the Plaintiffs believe that the Defendant cannot provide a full accounting of the Trust assets because of fraudulent acts and wrongful conversion of Trust proceeds." *Id.* ¶¶ 20–21. No specific fraudulent acts are alleged in the State Court Complaint, nor is there any description of how or in what fashion the Trust proceeds were converted.

In Count II of the State Court Complaint Plaintiffs recite various provisions of the Trust, and a listing of the certificates of deposit belonging to Ms. Debolt that were closed by Wendy, along with various sums of money Wendy deposited into the Trust's checking account. Specifically, in the numbered paragraphs of the State Court Complaint set forth below, the Plaintiffs make the following allegations:

28. The Defendant was named Attorney in Fact under a General Power of Attorney by Mrs. Debolt on February 22, 2006. A copy of said General Power of Attorney is attached and incorporated at Exhibit F.

29. The General Power of Attorney gave the Attorney in Fact the power to "transfer assets into or out of any living trust which I have established, whether I am disabled at the time of transfer or not," thus creating a confidential fiduciary relationship between the Defendant Wendy Thompson and Laura May Debolt.

30. This General Power of Attorney was created on February 22, 2006, which was prior to the date upon which the Laura May Debolt Trust [was] created, which was November 16, 2006.

31. The General Power of Attorney further gave the Attorney in Fact the power "to make gifts of assets to persons and entities as designated by my Attorney in Fact including but not limited to, the Attorney in Fact, but otherwise limited as follows: (i) No such gift shall be made to any one individual for any taxable year such that the Principal would be subject to a gift tax liability (ii) Said gifts shall be limited to those individuals and entities whom the Principal has designated as beneficiaries by his or her state [sic] either through a Last Will & Testament or Trust Agreement, and shall be made in such proportionate shares to all such beneficiaries so designated if such gift is made to any one of them."

32. Thereafter, Thompson used that General Power of Attorney to surrender at least four certificates of deposit on account with The Richwood Banking Company.

33. The Richwood Banking Company permitted an unknown individual (according to the bank's own records), whereupon Plaintiffs have information and belief to be the Defendant, to close Certificate # 49110 at the Richwood Banking Company on or about April 7, 2008. The value at closing is unknown. The penalty paid as the result of the early withdrawal is unknown.

34. Thompson deposited $7,000 into the Trust checking account (10249025) at the Richwood Banking Company on or about April 7, 2008.

35. Thompson closed Certificate # 4530 at The Richwood Banking Company on or about June 13, 2008. The value at closing is unknown. The penalty paid as the result of the early withdrawal is unknown.

36. Thompson deposited $19,672.34 into the Trust checking account (10249025) at the Richwood Banking Company on or about June 13, 2008.

37. Thompson closed Certificate # 49309 at The Richwood Banking Company on or about May 30, 2008. The value at closing is unknown. The penalty paid as the result of the early withdrawal is unknown.

38. Thompson deposited $7,890.77 into the Trust checking account (10249025) at the Richwood Banking Company on or about May 30, 2008.

39. Thompson closed Certificate # 49284 at The Richwood Banking Company on or about November 13, 2008. The value at closing is unknown. The penalty paid as the result of the early withdrawal is unknown.

40. Thompson deposited $9,959.44 into the Trust checking account (10249025) at [T]he Richwood Banking Company on or about November 13, 2008.

41. Thereafter, Thompson used that Business Power of Attorney[7] to surrender four additional certificates of deposit on account with The Huntington National Bank.

42. Thompson closed Certificate # 07481180199 at The Huntington National Bank on or about July 16, 2007. The value at closing was $10,004.97. The penalty paid as the result of the early withdrawal is unknown.

43. It is currently unknown where, if at all, the proceeds from that withdrawal were deposited.

44. Thompson closed Certificate # 07481180173 at The Huntington National Bank on or about July 16, 2007. The value at closing was $10,004.97. The penalty paid as the result of the early withdrawal is unknown.

45. It is currently unknown where, if at all, the proceeds from that withdrawal were deposited.

46. Thompson closed Certificate # 07481196361 at The Huntington National Bank on or about December 10, 2008. The value at closing was $9,991.43. The penalty paid as the result of the early withdrawal is unknown.

47. Thompson deposited $6,991.43 into the Trust checking account (10249025) at [T]he Richwood Banking Company on or about December 10, 2008.

48. Thompson closed Certificate # 07481196358 at The Huntington National Bank on or about January 20, 2009. The value at closing was $10,005.98. The penalty paid as the result of the early withdrawal is unknown.

49. Thompson deposited $8,005.98 into the Trust checking account

(10249025) at [T]he Richwood Banking Company on or about January 20, 2009.

50. Plaintiffs in this matter, a co-trustee and co-executors of Mrs. Debolt's estate, have been unable to obtain records of transactions to determine the location of assets which belong to the [T]rust, as these records are under the control of the Defendant as Attorney in Fact for Mrs. Debolt.

51. The Defendant has failed to fully account to the Trust for the proceeds from the closing of the foregoing Certificates of Deposit, and for her use of the Trust accounts, and appears to have converted the same to their personal use (e.g. for the benefit of Wendy and Jason Thompson) and benefit in violation of her fiduciary duties as an Attorney in Fact and successor co-trustee of the Trust. A copy of her accounting is attached.

52. Plaintiffs, upon information and belief, have reason to believe that a full accounting will reveal further instances of fraud and breach of Defendant's confidential fiduciary relationship with the [T]rust, and that the second Defendant, Jason A. Thompson, has assisted Thompson in perpetuating the fraud.

*Id.* ¶¶ 28–52 (references to exhibits omitted).

A review of paragraphs 28 through 50 of the State Court Complaint reveals no specific allegation of any fraudulent act or any misrepresentation on the part of the Defendants. Nor do those paragraphs allege that either Wendy or Jason obtained money or property from Ms. Debolt by fraud or misrepresentation. In paragraph 51 Plaintiffs allege that Wendy failed to account to the Trust for the proceeds of the certificates of deposit or of the trust accounts, and asserts that it "appears" that

**7.** The "Business Power of Attorney" is presumably the same as the "General Power of Attorney" referenced in ¶ 28 of the State Court Complaint.

the Debtors converted the proceeds of the certificates of deposit, and used the trust account to their benefit in violation of Wendy's fiduciary duties. *Id.* ¶ 51. And in paragraph 52 the Plaintiffs assert that a full accounting will reveal *"further"* instances of fraud and breach of [Wendy's] confidential fiduciary relationship with the [T]rust," and assistance by Jason "in perpetuating the fraud." *Id.* ¶ 52 (emphasis added). But in the paragraphs of Count II of the State Court Complaint preceding paragraphs 51–52 the Plaintiffs do not allege specific acts on the part of the Debtors that would constitute fraud or breach of fiduciary duty.

Finally, in the State Court Complaint's prayer for relief the Plaintiffs request three things: (1) an order requiring both Wendy and Jason to provide all records and an accounting for all funds of the Trust that had been collected, deposited, withdrawn or expended for any and all purposes under Wendy's power of attorney; (2) an order removing Wendy as co-trustee of the Trust if the state court should find that she violated her fiduciary duties to Ms. Debolt and the Trust; and (3) judgment in the total amount of Trust assets that both Debtors wrongfully withheld, transferred or expended. *Id.* at 5–6.

### 2. The State Court's Final Judgment Entry

In its Final Judgment Entry, the state court sets forth its findings under five separate headings, which are entitled "Huntington National Bank," "Richwood Bank," "Income," "Justifiable Expenses" and "Conclusion." Under the heading "Huntington National Bank," the court stated that two CDs (Nos. 0173 and 0199) were closed on July 16, 2007 and rolled into two new CDs (Nos. 6361 and 6358). Final J. Entry at 1. The court found that CD No. 6361 was closed on December 10,

2008 with a payout of $9,991.43, but found that "[t]here was no evidence or testimony presented as to the whereabouts or use of the funds withdrawn." *Id.* The Court found that CD No. 6358 was closed on January 20, 2009 with a payout of $10,005.98, and again, found that "[t]here was no evidence or testimony presented as to the whereabouts or use of the funds withdrawn." *Id.* In addition, the court found that Ms. Debolt had a savings account with a balance of $38,325.47 in September 2006; its balance was $1,241.23 on July 1, 2007, "prior to the first deposit of money from the CDs," and was $230.51 on April 1, 2010. *Id.* at 2. As to this savings account, the court stated that "[t]here was no evidence or testimony regarding the use of the funds withdrawn and no evidence or testimony of corresponding deposits." *Id.* at 2.

Under the heading "Richwood Bank," the court found the following with respect to certificates of deposit:

1. CD 49309 was closed on May 30, 2008, $20,000.00 of which was rolled into a new certificate of deposit, namely CD 4530, $4,890.77 was deposited into the checking account of Laura May Debolt and $4,890.98 was deposited into the savings account of Laura May Debolt.

2. CD 49110 was closed on April 7, 2008 and $2,821.59 was deposited into the savings account of Laura May Debolt and $7,000.00 was deposited into the checking account of Laura May Debolt.

3. CD 49964 was closed on July 5, 2007 with a payout of $5,000.00 being deposited in the savings account of Laura May Debolt.

4. CD 49284 was closed on November 12, 2008 with payouts of $9,959.44 and $40.56 deposited into the checking account of Laura May Debolt.

5. CD 4530 was closed on June 13, 2008 with a payout of $19,672.34 deposited in the checking account of Laura May Debolt.

*Id.* at 2. The court also found that (1) two Richwood Bank checking accounts in the name of Laura May Debolt, trustee or successor trustees of the Trust, held a balance of $11,225.64 as of September 2006, and a balance of $9,255.48 as of May 2010, and (2) there had been no account activity since 2009. *Id.* at 2.

Under the heading "Income," the court determined that during the period from September 2006 through February 2009, Ms. Debolt had income totaling $54,942.46 from savings account interest, certificate of deposit interest, social security and rental of a house and farm land. *Id.* at 2.

In its findings set forth under the heading "Justifiable Expenses," the state court listed some 50 persons or entities to whom payments had been made, and also listed the amounts paid to those parties, but did not state the total amount of those payments. *Id.* at 3. It also found that "expenses incurred at Walmart over the course of 25 months were completely unreasonable for the care of one woman, who also received mobile meals. Based upon the evidence presented and the testimony the Court finds $100.00 per month to be reasonable additional expenses, for a total of $2,500.00." *Id.* The court also determined that "[w]ith regard to the monies paid to Wendy Thompson, there was only a meager accounting provided by Defendant to Plaintiffs, then to this Court, to explain the expenses. With no accurate, detailed accounting the Court thoroughly reviewed the bank statements and copies of checks submitted into evidence." *Id.* at 3–4. The court then listed a number of checks written to Wendy that it found did constitute legitimate expenses. The court determined the total amount of "expenses to be offset from assets and income is $57,735.82." *Id.* at 3–4.[8]

In its "Conclusion" section, the court recites the following:

In September 2006, when Defendant Wendy Thompson began to actually write checks, Laura May Debolt had a checking account, number 4396, savings account, number 21925, two $10,000.00 certificates of deposit at Huntington Bank and three certificates of deposit (two for $10,000.00 and one for $30,000.00) at Richwood Bank. The total of Laura May Debolt's bank accounts and certificates of deposit in September 2006 was $119,551.11. As of February 2009, there remain two checking accounts, numbers 4396 and 9025, [and] a savings account, number 21925. The total held in those bank accounts is $9,485.99. All certificates of deposit in the name of Laura May Debolt, trustee or successor trustees of the Laura May Debolt trust are gone.

Subtracting from the $119,551.11 the sum [sic] the amount now remaining in the checking and savings accounts of [$]9,485.99 and adding the income of Laura May Debolt in the amount of $54,942.46, the Court finds that Defendants are accountable for $165,007.58. From that amount the Court has found from the evidence that there were legitimate expenses made on behalf of Laura May Debolt in the amount of $57,735.82, leaving $107,271.76 in monies missing

---

8. As stated above, the state court identified 50 persons or entities to whom Wendy made payments under the authority of the power of attorney The spreadsheet attached to the Final Judgment Entry, by contrast, listed 73 persons or entities to whom payments had been made. From the Final Judgment Entry it is unclear, but the Court assumes that these additional expenses were deemed by the State Court to be unjustified. Final J. Entry, Ex. A.

and unaccounted for by the Defendants. IT IS THEREFORE

**ORDERED, ADJUDGED AND DE- CREED** that Plaintiffs are granted judgment against Defendants, jointly and severally, in the amount of $107,271.76 plus interest at the statutory rate of 4% per annum from the date of this Entry. Costs to Defendants.

This is a final appealable order.

*Id.* at 4–5.

### B. The Nondischargeability Claims Asserted in the Complaint

The Complaint contains essentially the same allegations as the State Court Complaint, with the addition of a claim for avoidance of an alleged fraudulent transfer based on a conveyance made by the Debtors, following Ms. Debolt's death, of a portion of the real property they inherited from her. The portions of the Complaint that pertain to the Plaintiffs' nondischargeability claims, which are the subject of the Motion, are described below.

#### Count One—§ 523(a)(2)

Plaintiffs allege that the Debtors "violated ... [§ ] 523(a)(2) in that they obtained money, property and/or services by false pretenses, false representations, or actual fraud and/or [by] using statements in writing that were materially false." Compl. ¶ 54. The Complaint does not specify whether this nondischargeability claim is based on § 523(a)(2)(A), (a)(2)(B) or both of these provisions.

#### Count Two—§ 523(a)(4)

Plaintiffs assert that the Debtors "violated ... [§ ] 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny by wilfully and

maliciously converting assets[,]" including assets of the Trust and of Ms. Debolt's estate, and that those alleged actions by the Debtors "were deliberate and/or intentional [and were done] with the intent to cause injury to the Plaintiffs." Compl. ¶ 59.

#### Count Three—§ 523(a)(6)

According to the Plaintiffs, the Debtors "violated ... [§ ] 523(a)(6) by willfully and maliciously injuring Plaintiffs by willfully and maliciously converting assets including, but not limited to, tangible and indelible [sic] property" of the Trust and of Ms. Debolt's estate. They also allege that the Debtors concealed the conversion of the assets. Compl. ¶ 63.

### C. The Summary Judgment Motion, Response and Reply

In seeking partial summary judgment, Plaintiffs argue that, based on the Debtors' default in state court, "all operative facts of this adversary complaint have already been litigated by a competent court." Mot. at 4. As a result, they assert, all elements of §§ 523(a)(2), (4), and (6) have been established, the Final Judgment Entry should have preclusive effect, and the debt arising from their judgment in the amount of $107,271.76 should be declared nondischargeable.

By way of their Response the Debtors argue that the Motion should be denied for two reasons. First, the Plaintiffs disregarded the Court's Scheduling Order Following Pretrial Conference ("Scheduling Order") (Doc. 23), in that they failed to set forth a complete and accurate statement of material facts, with each fact supported by a specific citation to the record.[9] Resp. At

---

**9.** The Debtors are correct on this point. The Plaintiffs did not make even a passing attempt to comply with the Scheduling Order, which specifically states that "[a]ny motion for sum- mary judgment shall contain a 'Statement of Material Facts.' The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact as to which the moving

4–5. Second, Debtors assert that the state court default judgment provides an insufficient basis upon which to grant summary judgment, because the issues Plaintiffs seek to preclude were not "actually litigated" below, and no evidence was produced to support a finding that the elements of §§ 523(a)(2), (4) and (6) have been met. They argue that the Final Judgment Entry upon which the Plaintiffs rely contains no findings of fact or conclusions of law that would establish the type of misconduct on the Debtors' part that would support a nondischargeability judgment by this Court—that is, fraud, defalcation by a fiduciary, conversion, embezzlement, larceny or willful and malicious injury. *Id.* at 12–16.

In their Reply, Plaintiffs maintain that language in the Final Judgment Entry stating that Wendy wrote checks on Ms. Debolt's account, that certain funds were "missing and unaccounted for," and that certain expenses "were completely unreasonable for the care of one woman," coupled with the Debtors' admission of all allegations by virtue of their initial default, provide a sufficient basis to warrant the Court's application of collateral estoppel. According to the Plaintiffs, the doctrine of collateral estoppel requires a determination that the state court judgment is nondischargeable because (1) the parties in the state court action are the same as the parties in this adversary proceeding, (2) a final judgment on the merits was entered in state court following a full and fair opportunity for the Debtors to litigate, (3)

the issue of fraud was admitted by default and was necessary to the final judgment, and (4) the issues of fraud presented in state court were identical to the issues of fraud before the Court here. Reply at 12.

## IV. Legal Analysis

### A. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure ("Civil Rule(s)"), made applicable in this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule(s)"), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Civil Rule 56(a). "On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Ricci v. DeStefano,* 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (internal quotation marks omitted). A dispute is genuine only if it is "based on evidence upon which a reasonable [finder of fact] could return a [judgment] in favor of the non-moving party." *Gallagher v. C.H. Robinson Worldwide, Inc,* 567 F.3d 263, 270 (6th Cir.2009). And "[a] factual dispute concerns a 'material' fact only if its resolution might affect the outcome of the suit under the governing substantive law." *Id.* "The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and iden-

party contends there exists no genuine issue. Each fact listed must be supported by a specific citation to the record." Scheduling Order at 3. Plaintiffs violated the Scheduling Order by failing to (1) specifically enumerate the material facts they claim to be undisputed and (2) provide supporting citations to the summary judgment record. In so doing, the Plaintiffs forced the Court to undertake the extraordinarily time-consuming exercise of

culling through the documents provided to gain the information necessary to evaluate the arguments presented. The Plaintiffs' failure to abide by the Scheduling Order would alone provide a basis to deny the Motion. The Court opted to rule on the Motion, however, to spare the parties the needless procedural exercise of refiling and opposing a request for summary judgment that lacks substantive merit.

tifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any which it believes demonstrate the absence of a genuine issue of material fact." *Ray's Servs., Inc. v. Cunningham (In re Cunningham)*, No. 123201, 2014 WL 1379136, at *2 (Bankr.N.D.Ohio Apr. 8, 2014) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A genuine issue for trial exists if the evidence is such that a reasonable factfinder could find in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. Issue Preclusion

The Plaintiffs seek summary judgment in their favor on the basis of the collateral estoppel effect of the state court orders. The purpose of the collateral estoppel doctrine—also known as issue preclusion[10]—is to prevent the relitigation of issues of fact or law, necessary to the judgment, that have already been decided between the same parties. *See Wagner v. Schulte (In re Schulte)*, 385 B.R. 181, 188 (Bankr.S.D.Ohio 2008). The party seeking to invoke issue preclusion has the burden of establishing its applicability. *See Simmons Capital Advisors, Ltd. v. Bachinski (In re Bachinski)*, 393 B.R. 522, 535 (Bankr.S.D.Ohio 2008). Under 28 U.S.C. § 1738, federal courts must give the same "full faith and credit" to a state court judgment as would be given by the laws of that state. *Fordu*, 201 F.3d at 703. Thus, a federal court "faced with the question of

whether to give full faith and credit to a state court default judgment [must] 'consider first the law of the State in which the judgment was rendered to determine its preclusive effect.'" *Bay Area Factors v. Calvert (In re Calvert)*, 105 F.3d 315, 317 (6th Cir.1997) (quoting *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985)). And "[t]he doctrine of collateral estoppel applies in dischargeability actions under 11 U.S.C. § 523(a)." *Rally Hill Prods., Inc. v. Bursack (In re Bursack)*, 65 F.3d 51, 53 (6th Cir.1995) (citing *Grogan v. Garner*, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) ("We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a).")). "Bankruptcy courts' exclusive jurisdiction over dischargeability issues does not alter this rule." *Bursack*, 65 F.3d at 53. The fact that Congress intended bankruptcy courts to determine issues of dischargeability does not require the bankruptcy court to redetermine all the underlying facts. *See Schulte*, 385 B.R. at 189 (citing *Spilman v. Harley*, 656 F.2d 224, 227 (6th Cir.1981)).

To determine whether Ohio courts would give preclusive effect to a prior judgment, the Court must find four elements:

1) A final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue; 2) The issue must have been actually and directly litigated in the prior suit and must have been necessary to the final judgment; 3)

---

**10.** The Sixth Circuit noted in *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693 (6th Cir.1999) that the United States Supreme Court has expressed a preference for use of the terms "issue preclusion" and "claim preclusion" rather than the traditional phrases "res judicata" and "collateral estoppel." *Fordu*, 201 F.3d at 702–03 (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)). "Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been actually litigated and decided." *Migra*, 465 U.S. at 77 n. 1, 104 S.Ct. 892.

The issue in the present suit must have been identical to the issue in the prior suit; 4) The party against whom estoppel is sought was a party or in privity with the party to the prior action.

*Sill v. Sweeney (In re Sweeney)*, 276 B.R. 186, 189 (6th Cir. BAP 2002). When that prior judgment is a default judgment, it "must contain express findings in order to be given preclusive effect in subsequent litigation between the parties." *Id.* at 193.

■ In *Hinze v. Robinson (In re Robinson)*, 242 B.R. 380 (Bankr.N.D.Ohio 1999), the bankruptcy court found that in order to meet the "actual litigation" requirement of issue preclusion when the underlying judgment is obtained by default, two circumstances must exist:

First, the plaintiff must actually submit to the state court admissible evidence apart from his pleadings. In other words, a plaintiff's complaint, standing alone, can never provide a sufficient basis for the application of the collateral estoppel doctrine. Second the state court, from the evidence submitted, must actually make findings of fact and conclusions of law which are sufficiently detailed to support the application of the collateral estoppel doctrine in the subsequent proceeding. In addition, given other potential problems that may arise with applying the collateral estoppel doctrine to default judgments (e.g., due process concerns), this Court will only make such an application if the circumstances of the case would make it equitable to do so.

*Id.* at 387. The Sixth Circuit Bankruptcy Appellate Panel specifically adopted the rule set forth in *Robinson*, stating: "Considering the Ohio authority that does exist, we find *Robinson* to be a competent and useful prediction of the rules the Supreme Court of Ohio would adopt if it were to pass directly on this question. According-

ly, we adopt the basic standard in *Robinson* as our rule of decision in this case." *Sweeney*, 276 B.R. at 194.

Applying the principles stated in *Sweeney* here, the Court finds there is no dispute that the state court issued a final judgment when it entered the Final Judgment Entry. Nor is there any question that the parties in the state court action are identical to the parties named in the Complaint. Thus, as to the Final Judgment Entry, two of the four elements required to apply the doctrine of issue preclusion have been established by the Plaintiffs. While the Docket notation reflecting the filing of an answer prior to the state court's entry of default judgment raises a question as to the issue of whether the Debtors had a fair and full opportunity to litigate in the state court, they have not raised this issue in opposing the Motion.

Thus, remaining for determination are the questions of whether the issues raised in the Complaint are identical to the issues in the State Court Action, and whether the issues were actually and directly litigated in the prior suit and were necessary to the final judgment.

### 1. Identity of Issues/Necessary to Final Judgment

■ Under Ohio law, the party moving for the application of the doctrine of collateral estoppel needs to establish, among other matters, that the issue in the present suit is identical to the issue involved in the prior suit and that such an issue was actually and directly litigated in the prior suit. In a dischargeability action, these requirements can only be met by showing that the factual issues in the prior proceeding were determined 'using standards identical to those in the dischargeability proceedings....'

*Hoffman v. Anstead (In re Anstead),* 436 B.R. 497, 501 (Bankr.N.D.Ohio 2010) (citations omitted). In determining whether the issues raised in the Complaint are identical to the issues adjudicated in the State Court Action, the Court must analyze the elements of Plaintiffs' nondischargeability claims, which are asserted under § 523(a)(2), (4) and (6) of the Bankruptcy Code.

### a. Section 523(a)(2)

A debt may be excepted from discharge under § 523(a)(2), if the debt is

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

[or]

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(A) and (B).

Here, while the Complaint asserts a cause of action under both subsections (a)(2)(A) and (a)(2)(B), neither the Motion nor the Response mentions (a)(2)(B). And neither the State Court Complaint nor the Complaint references or describes the use by Wendy and/or Jason of any statement in writing, false or otherwise, respecting their financial condition, on which the Plaintiffs reasonably relied to their detriment. Thus, on this record, the Plaintiffs clearly are not entitled to summary judgment on their § 523(a)(2)(B) claim.

For the court to find a debt nondischargeable under § 523(a)(2)(A), a creditor must prove:

(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT & T Universal CardServ., Inc. (In re Rembert),* 141 F.3d 277, 280–81 (6th Cir.1998). "[T]he elements of common law fraud in Ohio are substantially equivalent to those required to establish a nondischargeable debt based on false representation under § 523(a)(2)(A)." *Schafer v. Rapp (In re Rapp),* 375 B.R. 421, 430 (Bankr.S.D.Ohio 2007). They include:

(1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance.

*Unencumbered Assets, Trust v. JPMorgan Chase Bank (In re Nat'l Century Fin. Enters., Inc., Inv. Litig.),* 604 F.Supp.2d 1128, 1149 (S.D.Ohio 2009) (citing *Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 570 N.E.2d 1076, 1083–84 (1991)).

### b. Section 523(a)(4)

Section 523(a)(4) excepts from discharge any debt "for fraud or defalca-

tion while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). In the Sixth Circuit, the defalcation provision of this section is limited only to those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor. *Commonwealth Land Title Co. v. Blaszak (In re Blaszak),* 397 F.3d 386, 391 (6th Cir.2005) (citing *R.E. Am., Inc. v. Garver (In re Garver),* 116 F.3d 176, 180 (6th Cir.1997)). "It is well established that the defalcation provision of § 523(a)(4) applies to express or technical trusts, but not to constructive trusts that courts may impose as an equitable remedy." *Id.* "This rule is limited to a trust relationship arising from the placement of a specific res in the hands of the debtor." *Astro Bldg. Supplies, Inc. v. Slavik,* 443 Fed.Appx. 993 (6th Cir.2011). "To establish the existence of an express or technical trust, a creditor must demonstrate: "(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary.'" *Bd. of Trs. of Ohio Carpenters & Pension Fund v. Bucci (In re Bucci),* 493 F.3d 635, 640 (6th Cir.2007) (quoting *Blaszak,* 397 F.3d at 391–92). Further, there is no breach of fiduciary duty where a debtor is authorized to take the action taken. *See King's Welding & Fabricating, Inc. v. King,* No. 5:11CV1792, 2012 WL 3732514, at *10 (N.D.Ohio Aug. 27, 2012).

 In order to prove embezzlement under § 523(a)(4), a creditor must show "that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Brady v. McAllister (In re Brady),* 101 F.3d 1165, 1173 (6th Cir.1996). Larceny is "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without out the consent of the owner." *Graffice v. Grim (In re Grim),* 293 B.R. 156, 166, n. 3 (Bankr.N.D.Ohio 2003). "Embezzlement differs from larceny in that the embezzler's initial acquisition of the property is lawful." *Baker v. Wentland (In re Wentland),* 410 B.R. 585, 596 (Bankr.N.D.Ohio 2009).

### c. Section 523(a)(6)

 Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). "From the plain language of the statute, the judgment must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455, 463 (6th Cir.1999). In *Markowitz,* the Sixth Circuit adopted the following standard: "we now hold that unless 'the actor desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it,' Restatement (Second) of Torts § 8A, at 15 (1964), he has not committed a 'willful and malicous injury' as defined under § 523(a)(6).'" *Id.* at 464. "[O]nly acts done with the intent to cause injury—and not merely acts done intentionally—rise to the level of willful and malicious injury for purposes of satisfying § 523(a)(6)." *Kennedy v. Mustaine (In re Kennedy),* 249 F.3d 576, 581 (6th Cir.2001) (citing *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)). And in *Geiger,* the Supreme Court held that to satisfy the standard of a "willful" injury under § 523(a)(6), the creditor must show that the debtor committed a "deliberate or intentional *injury,* not merely a deliberate or intentional act that leads to injury." *Geiger,* 523 U.S. at 61, 118 S.Ct. 974. A "more encompassing interpretation could

place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, i.e., neither desired nor in fact anticipated by the debtor." *Id.* at 62, 118 S.Ct. 974. *See also Salem Bend Condo. Ass'n v. Bullock–Williams (In re Bullock–Williams)*, 220 B.R. 345, 347 (6th Cir. BAP 1998).

### d. Common Element of Intent or Scienter

A finding of nondischargeability under §§ 523(a)(2), (4) and (6) requires the common element of scienter, "whether it is an intent to defraud/deceive under § 523(a)(2), a[ ] [fraudulent] intent to misappropriate another's property [where the nondischargeability claim is based on embezzlement or larceny] under § 523(a)(4)[,] or the intentional injury to another's property under § 523(a)(6)." *Anstead*, 436 B.R. at 500. *See also NCM Enters. Sand & Stone Ltd. v. Earnest (In re Earnest)*, No. 12–3040, 2013 WL 795399, at *5 (Bankr.N.D.Ohio March 1, 2013) ("In an action brought under either § 523(a)(2) or § 523(a)(4), it is generally necessary to show that the ... Defendant committed the type of intentional conduct necessary to hold a debt nondischargeable. [A finding of nondischargeability] cannot, as suggested by the Plaintiffs, be inferred [simply] from the imposition of liability against the Defendant in the state-court judgment."); *Kimco Leasing Co. v. Wilson (In re Wilson)*, 383 B.R. 678, 681 (Bankr. N.D.Ohio 2007) ("[B]y its express terms, § 523(a)(6) requires that the injury be both willful and malicious.").

Section 523(a)(4) nondischargeability claims based on a debtor's alleged defalcation as a fiduciary likewise require a showing of scienter. The Supreme Court recently "held that the term 'defalcation' is treated similarly to 'fraud' for purposes of § 523(a)(4)." *Hart v. Karaeff (In re Hart)*, BAP No. NC–14–1154–JuTaPa, 2015 WL 845569, at *11 (9th Cir. BAP Feb. 26, 2015) (citing *Bullock v. BankChampaign, N.A.*, —— U.S. ——, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013)). In *Bullock* the Court ruled that defalcation "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase. We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id.* at 1757. Where actual knowledge is lacking, the *Bullock* Court found that intent can still be shown for purposes of § 523(a)(4) if the "fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* at 1759–60.

The Plaintiffs have not met their burden of demonstrating an identity of issues or that a finding of either scienter or intent to injure was necessary to the state court's Final Judgment Entry. A review of the two counts in the State Court Complaint, along with the Plaintiffs' requests for relief stated in the prayer, reveals nothing that would require the state court to make a finding regarding either Debtor's state of mind. The allegations in the State Court Complaint consist primarily of statements that the Debtors failed to assist in creating a complete accounting of the Trust assets, and recitations of certificates of deposits closed and monies deposited into the Trust checking account. Absent are any specific allegations that the failure to assist in an accounting of the assets, or the closing of the certificates of deposit and/or the depositing of funds was fraudulent, or was intended to deceive, defraud, misappropriate property or otherwise cause harm or injury. The Plaintiffs asked for an accounting, an order remov-

ing Wendy as a co-trustee of the Trust if they established that she had violated fiduciary duties to Ms. Debolt and the Trust, and for a money judgment in the total amount of assets "wrongfully withheld, transferred or expended." State Ct. Compl. at 6.

 The Default Judgment Order establishing liability by default contains no findings whatsoever. And the Final Judgment Entry is also devoid of any findings regarding the existence of a fiduciary duty,[11] a breach of fiduciary duty or a wrongful withholding, transfer or expenditure of assets. It simply recites that monies were missing and unaccounted for by the Debtors without making a finding as to whether this was a result of an intentional, wrongful act—or for that matter, even negligence or mere inadvertence. As to the funds withdrawn from the closing of the Huntington National Bank certificates of deposit, the state court twice stated that "[t]here was no evidence or testimony as to the whereabouts or use of the funds withdrawn." Final J. Entry at 1. It found that Walmart expenses were "completely unreasonable for the care of one woman," *id.* at 3, but it made no finding that the funds expended were as a result of any act intended to cause injury, be it by fraud, misrepresentation, conversion, defalcation by a fiduciary (as defined by the Supreme Court in *Bullock*), embezzlement, larceny or breach of fiduciary duty. As to monies

---

**11.** The state court made no finding that either Wendy or Jason had a fiduciary relationship as that term is used in § 523(a)(4). Jason was never a trustee of the Trust. And Wendy did not become co-trustee of the Trust until she accepted that role in March 2009 following Ms. Debolt's death. The closing of certificates of deposit and the depositing of funds into the Trust's checking accounts, as well as the payment of monies to various entities and individuals, all as set forth in the Final Judgment Entry, occurred during the period from September 2006 through February 2009, and all predate Wendy's capacity as a co-trustee of the Trust. Nevertheless, a fiduciary relationship between Wendy and Ms. Debolt was established at the time Ms. Debolt executed the power of attorney naming Wendy her attorney in fact. Under Ohio law, "[t]he holder of a power of attorney has a fiduciary relationship with the principal." *Cartwright v. Batner*, 15 N.E.3d 401, 417 (Ohio Ct.App.2014) (internal quotation marks omitted). "Such a relationship is 'one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.' " *Id.* (quoting *Stone v. Davis*, 66 Ohio St.2d 74, 419 N.E.2d 1094, 1097–98 (1981)). "[A]s a general rule a power of attorney does not give rise to the fiduciary capacity required by section 523(a)(4)[.]" *Taatjes v. Maggio (In re Maggio)*, 518 B.R. 179, 190 (Bankr.D.Mass.2014). True, a power of attorney may sometimes create "a sufficiently elevated level of fiduciary duty" such that a debt incurred by the attorney in fact to the principal is nondischargeable under § 523(a)(4). *Id.* For example, in a case where the state court had found that the debtor owed his mother "an express fiduciary duty as a result of the Power of Attorney . . . and that by virtue of the relationship, the [debtor] assumed responsibility regarding the control and coordination of her financial affairs," the bankruptcy court determined that, "in light of [the mother's] diminished mental and physical health, the state court's findings sufficiently establish a fiduciary relationship within the meaning of § 523(a)(4)." *Wians v. Wians (In re Wians)*, 523 B.R. 124, 133 (Bankr.N.D.Ill.2014). But here the state court made no findings that would permit this Court to conclude that the debt at issue is nondischargeable under § 523(a)(4). Similarly, in *Maggio* the bankruptcy court was unable to determine based on the summary-judgment record "whether the fiduciary duty established by the power of attorney . . . [imposed] duties . . . on the Debtor [that] were sufficiently elevated to satisfy the requirements of section 523(a)(4)" and thus denied the plaintiffs' motion for summary judgment, concluding that issue preclusion "cannot be used to establish that any debt owed by the Debtor to the Plaintiffs as a result of the state court judgment is nondischargeable under section 523(a)(4)." *Maggio*, 518 B.R. at 190–91.

paid to Wendy, the state court found "only a meager accounting," but again, made no finding that the funds received by Wendy were obtained by her through any act that would cause the debt to be excepted from discharge under § 523(a).

## 2. Actually and Directly Litigated

 The Plaintiffs argue that, by virtue of Ohio Civil Rule 8(d), Wendy and Jason have admitted to fraudulent behavior as outlined in the State Court Action.[12] Those admissions, according to the Plaintiffs, satisfy the "actually and directly litigated" element necessary to the application of issue preclusion. But as the Sixth Circuit Bankruptcy Appellate Panel made clear in *Sweeney*, a mere failure to answer the factual allegations contained in a plaintiff's state court complaint, standing alone, can never provide a sufficient basis for the application of the collateral estoppel doctrine in a dischargeability proceeding. *Sweeney*, 276 B.R. at 193–94; *see also Robinson*, 242 B.R. at 387. Moreover, a review of the State Court Complaint reveals that it does not set forth with any specificity the purported fraudulent con-

duct on the part of Wendy and/or Jason that they are deemed to have "admitted" by their default.

 "When assessing whether a state court judgment is entitled to preclusive effect in a dischargeability action, a bankruptcy court may review the entire record in the state court case to determine the grounds for, or the meaning of the state court's judgment or order." *Cunningham*, 2014 WL 1379136, at *8; *see also Miller v. Grimsley (In re Grimsley)*, 449 B.R. 602, 615 (Bankr.S.D.Ohio 2011). Here, while the Default Judgment Order established liability on the part of the Debtors, it is difficult to understand the basis on which liability was found, given the paucity of detail in the State Court Complaint.[13]

While it appears from the Final Judgment Entry that the Plaintiffs presented evidence to the state court regarding damages, nothing in the record suggests that they submitted evidence as to the Debtors' alleged fraud or other misconduct. And even if "the Plaintiffs in this case . . .

12. Ohio Rule of Civil Procedure 8(D) provides: "Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading. Averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided." Ohio Civ. R. 8 (West 2015).

13. Rule 9(B) of the Ohio Rules of Civil Procedure, like Civil Rule 9(b) and Bankruptcy Rule 7009(b), requires that a party alleging fraud must state with particularity the circumstances constituting fraud. "Interpreting the requirements of Rule 9(B), Ohio courts note that '[t]he 'circumstances constituting fraud' to which Civ. R. 9(B) refers normally include the time, place and content of the false representation, the fact misrepresented, and the nature of what was obtained or given as a consequence of the fraud.'" *Henkel v. Yust (In re Henkel)*, 490 B.R. 759, 778 (Bankr.

S.D.Ohio 2013) (citing *Baker v. Conlan*, 66 Ohio App.3d 454, 585 N.E.2d 543, 546 (1990)). Here, Counts I and II of the State Court Complaint contained only bare statements that the Debtors engaged in fraud, without specifying the circumstances. "Where statements in the Complaint involve legal conclusions, those items cannot be admitted as true." *Trs. of the Iron Workers Dist. Council of New England Pension, Health & Welfare, Annuity, Vacation, & Educ. Funds v. Mayo (In re Mayo)*, No. 04–1067, 2007 WL 2713064, at *2 (Bankr.D.Vt.2007). The specific instances outlined in Counts I and II—failing to make an accurate accounting, closing certificates of deposit and depositing funds in the Trust's checking account—entirely lacked any averment that those acts were fraudulent. Thus, the Debtors' default did not result in their admission to any specifically pleaded allegation of fraud.

submitted evidence from which the Ohio court *could* have found the kind of fraud that would bar a discharge in bankruptcy, it is apparent that the court made no findings of fact or conclusions of law with respect thereto, not even informal ones." *Sweeney,* 276 B.R. at 194. Indeed, the Final Judgment Entry is notable for what it does not contain. It includes no specific findings by the state court establishing that Wendy and/or Jason had a fiduciary relationship with Ms. Debolt or the Plaintiffs, that they intended to deceive her or the Plaintiffs, that they engaged in any act of fraud, obtained money from Ms. Debolt or the Plaintiffs through a misrepresentation on which she/they reasonably relied, or that their activities constituted defalcation by a fiduciary (as defined by the Supreme Court in *Bullock),* conversion, embezzlement, larceny or willful and malicious injury. As in Sweeney, "[i]t is this lack of clarity that contributes to our conclusion that the state court's brief statement does not meet the test in *Robinson* because it is not 'sufficiently detailed to support the application of the collateral estoppel doctrine.'" *Id.* (quoting *Robinson,* 242 B.R. at 387). As in *Sweeney,* the Court here is faced with an incomplete state court record consisting of a Final Judgment Entry that. lacks the specific findings required to establish an exception to discharge under §§ 523(a)(2), (4) or (6) of the Bankruptcy Code.

### V. Conclusion

For the foregoing reasons, the Motion is **DENIED.** A status conference at which a trial date will be set will be scheduled by separate order.

**IT IS SO ORDERED.**